Federal Ornamental Iron and Bronze Company v. Commissioner.
Federal Ornamental Iron & Bronze Co. v. Commissioner
Docket No. 1278-65.
United States Tax Court
T.C. Memo 1969-72; 1969 Tax Ct. Memo LEXIS 222; 28 T.C.M. (CCH) 391; T.C.M. (RIA) 69072; April 16, 1969, Filed *222 Held: (1) Petitioner accumulated its earnings and profits for the taxable years 1960 and 1961 beyond the reasonable needs of its business in those years, and beyond the reasonably anticipated needs of its business; and (2) petitioner was availed of during the taxable years for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being distributed. A. A. Tiscornia [1] and Albert G. Evans, 111 Sutter, San Francisco, Calif., for the petitioner. Sheldon M. Sisson, for the respondent. HARRON, Judge: The respondent determined that the petitioner is subject to the accumulated earnings tax under section 531, 1954 Code, in the amount of $14,647.31 for 1960, and $13,966.83 for 1961. The main questions are whether, in 1960 and 1961, petitioner permitted its earnings and profits to accumulate beyond the reasonable needs of the business, including the reasonably anticipated *223 needs; and whether, in the same years, petitioner was availed of, for the purpose of avoiding the surtax with respect to its shareholders, by permitting its earnings and profits to accumulate instead of dividing or distributing them. Findings of Fact The stipulated facts are so found, and are incorporated herein by reference. Petitioner filed its returns for the taxable years with the district director of internal revenue at San Francisco, California. Petitioner keeps its books and files its returns on a calendar year basis and uses an inventory method in reporting income. Petitioner is a California corporation which was organized on December 3, 1919. At all times since its organization, petitioner's business has been the manufacturing and fabricating of ornamental, metal fixtures made of bronze, iron or aluminum, made from metal castings or metal extrusions. Its lines of products have been mainly aluminum, iron, or bronze fixtures which are installed in the offices of banks. Such fixtures include metal grills, gates, counters, and doors. Since June, 1951, its factory and plant have been located in the City of 392 Sausalito, Marin County, California, in a section thereof called Marinship. *224 Sausalito is located on the north side of San Francisco Bay, a short distance from San Francisco. Petitioner has always maintained its business office in San Francisco. A. A. Tiscornia, deceased, a lawyer, was the president, director, and controlling shareholder of the petitioner at all times from 1924 until the time of his death in 1967. He directed the purchasing of materials and metals for the petitioner, directed its affairs, negotiated its contracts, and rendered substantial and valuable services in petitioner's business during the taxable years and in all prior years while he was its president. He was a man of very large and substantial personal wealth. For convenience, he is referred to hereinafter simply as Tiscornia, and petitioner is referred to as Federal. Federal specialized in obtaining business from banks on a negotiated basis. The Bank of America and The United California Bank have been its chief customers. When Federal was incorporated in 1919, its authorized stock was 50,000 shares of capital stock of a par value of $1 per share. There were issued for cash 33,400 shares. In November, 1929, Federal's articles of incorporation were amended to allow a recapitalization *225 and to authorize $500,000 capital consisting of 25,000 shares of 6 percent cumulative preferred stock having a par value of $10 per share, and 25,000 shares of common stock also having a par value of $10 per share. Federal received from the Corporation Department of California permits to issue the shares of new stock under the recapitalization, dated December 10 and 19, 1929. In 1960 and 1961, and before, the outstanding shares of stock of Federal were its common (capital) stock, of which 19,279 shares were outstanding and were owned as follows: A. A. Tiscornia, 14,764 shares (76.58 percent); Mortgage Underwriting & Realty Co., 4,513 shares (23.41 percent); A. B. Copeland, 1 share (.005 percent); and "Other", 1 share (.005 percent). A. B. Copeland is an officer of Federal, the secretary. She is also known as Alice B. Copeland. She has held the office of secretary for at least 15 years. The Mortgage Underwriting and Realty Company is a corporation in which Tiscornia was the controlling shareholder. In the taxable years, and before, its outstanding shares consisted of 453 shares of capital stock which was owned as follows: A. A. Tiscornia, 406 shares (89.62 percent); A. B. Copeland, *226 46 shares (10.15 percent); and "Other", 1 share (.23 percent). The earnings and profits, or surplus of Mortgage Underwriting and Realty Company during 1960 and 1961 were not in excess of $43,858.45. During the taxable years, and before, since 1929, Federal has been the controlling shareholder of Federal Mail Chute Corporation, Ltd., its subsidiary. Federal owns two-thirds of the outstanding shares of Federal Mail Chute Corporation. The office of the subsidiary corporation is located in the office of Federal in San Francisco. The business of Federal Mail Chute Corporation is described hereinafter. During the years 1941 through 1961, a period of 21 years, Federal did not declare and pay any dividends. It did not pay a salary to Tiscornia. However, Federal paid him $1,800 each year to cover and reimburse him for expenses incurred and paid by him in Federal's behalf. It is stipulated that in 1952, a constructive dividend of $30,000 was paid by Federal to Tiscornia. The directors of Federal in 1960 and 1961 were Tiscornia, Copeland, and Atilla A. Chiappari. During 1960 and 1961, Federal employed from 8 to 10 employees. No one was trained to succeed Tiscornia in the management and operations *227 of Federal in the event he retired. At the time of his death in 1967, Tiscornia was between 82 and 83 years old. The gross receipts, manufacturing and business expenses, and net receipts from 393 the business of Federal during the taxable year, as shown by its income tax return, and its other income, net taxable income and federal income tax paid were as follows, for 1960: 1960
Foundry and Metal Business:
Gross receipts
$101,417.92
Costs and mfg. expenses:
Materials for mfg.
$34,600.36
Wages
23,823.09
Manufacturing expenses
11,625.19
Machine depreciation
1,782.53
$71,831.17
Less jobs in process
11,633.00
Factory costs
$60,198.17
60,198.17
Gross profit
$ 41,219.75
Other deductions:
Gen. and Admin. expenses
2,790.85
Depreciation
789.47
Interest
125.14
Taxes:
Real estate
3,031.33
California franchise
1,763.42
Personal property
451.93
8,952.14
Net business income
$ 32,267.61
Other income:
Dividends
$27,962.32
Interest
10,249.28
Long-term gain
6.96
Other
3,271.33
41,489.89
Total net income
$ 73,757.50
Less special deduction, 85% dividends received
23,767.97
Taxable income
$ 49,989.53
Income tax paid
$ 20,494.55 At the beginning of 1960, Federal's earned surplus and undivided profits amounted to $492,107.85. At the end of 1960, earned surplus *228 and undivided profits had increased, according to its balance sheet in its tax return, by $65,149.23, to $557,257.08. The increase, according to its tax return, represented the following: Taxable income, 1960, before special deduction
$73,757.50
Less federal income taxes
8,608.27
$65,149.23 Since Federal's taxable income in 1960, before the special deduction for dividends received, was $73,757.50, and since its actual income tax for 1960 was $20,494.55, Federal's actual accumulation of its 1960 taxable income amounted to $53,262.95. Respondent, upon his audit of Federal's 1960 return, did not change or adjust Federal's taxable income for 1960, as reported. Respondent's determination of a tax deficiency was made under section 531 of the 1954 Code, as follows: He determined 394 that Federal had accumulated its 1960 taxable income in the amount of $53,262.95, as shown above, and he imposed upon that amount the accumulated earnings tax of 27 1/2% of the above amount of accumulated income. The 27 1/2% tax amounts to $14,647.31, which is the tax deficiency in dispute here. Respondent made a similar determination of a deficiency for 1961 based upon the accumulated earnings tax, the details of *229 which are set forth hereinafter. In the statutory deficiency notice, respondent's explanation of his determinations is as follows: It is determined that in each of the years, 1960 and 1961, the corporation was availed of for the purpose of preventing the imposition of the surtax on its shareholders through the medium of permitting earnings and profits to accumulate instead of being distributed and, therefore, it is subject to the accumulated earnings tax under section 531 of the 1954 Internal Revenue Code. Federal's business income and expenses, and net business income for 1961, and its other income, net taxable income, and federal income tax paid were as follows: 1961
Foundry and Metal Business:
Gross receipts
$104,663.18
Costs and mfg. expenses:
Materials for mfg.
$18,007.12
Wages
17,101.57
Manufacturing expenses
14,036.30
Machine depreciation
1,853.14
$51,003.13
Plus jobs in process
9,006.19
Factory costs
$60,009.32
60,009.32
Gross profit
$ 44,658.86
Other deductions:
Gen. and Admin. expenses
3,003.68
Depreciation
839.47
Interest
481.18
Taxes
6,645.99
10,970.32
Net business income
$ 33,688.54
Other income:
Dividends
$24,048.26
Interest
11,188.27
Long-term gain
9,340.77
Other
3,281.50
47,858.80
Total net income
$ 81,547.34
Less special deduction, 85% dividends received
20,441.02
Taxable income
$ 61,106.32
Income tax paid
$ 23,753.28
*230 At the beginning of 1961, Federal's earned surplus and undivided profits amounted to $557,257.08. During 1961, $30,000 was restored on Federal's books to earned surplus to correct a bookkeeping error in 1958. This item related to the cost of some real property purchased in 1952. The above addition increased earned surplus to $587,257.08. The year-end increase of earned surplus was in the net amount of $61,052.79 ($81,547.34, taxable income for 1961 before special deduction for dividends received, less $20,494.55 395 for 1961 income tax), which increased the earned surplus and undivided profits at the end of 1961 to $648,309.87. Respondent, upon his audit of Federal's 1961 return, did not change or adjust its 1961 income as reported, but his determination under section 531 was as follows: 1961 taxable income, before special deduction
$81,547.34
Less federal income tax
23,753.28
$57,794.06
Less net capital gain
7,005.58
Accumulated taxable income
$50,788.48 Respondent computed the 27 1/2 percent accumulated earnings tax on $50,788.48 to be $13,966.83. The reason for his determination has been set forth above. As shown above, Federal's net income from its foundry and metal manufacturing business *231 was $32,267.61, in 1960, and $33,688.54 in 1961. Federal's inventories at the end of 1960 amounted to $15,301.08; and at the end of 1961 amounted to $12,438.30. The cost of merchandise purchased for use in making its products was $28,487.79 in 1960, and $15,144.34 in 1961. Its jobs in process at the end of 1960 and 1961 amounted to $40,213.11 and $31,206.92, respectively. (See p. 26.) According to Federal's balance sheets in its tax returns for 1960 and 1961, Federal had on hand at the beginning and end of 1960, and the end of 1961, cash, Government obligations, stocks and bonds as follows: 1/1/60
12/31/60
12/31/61
Cash
$374,013.22
$431,537.86
$498,027.97
Government obligations
1,000.00
1,000.00
1,000.00
Stocks and bonds
150,906.59
150,608.02
150,811.08
Total
$525,919.81
$583,145.88
$649,839.05 Most of the above cash-on-hand was deposited in savings accounts. Federal's only liabilities, exclusive of its capital stock, and earned surplus, at the beginning and end of 1960, and the end of 1961 were as follows: 1/1/60
12/31/60
12/31/61
Accounts payable
$29,587.37
$31,460.53
$28,820.42
Payroll
12,473.08
13,408.28
14,437.75
Total
$42,060.45
$44,868.81
$43,258.17 Federal's capital and earned surplus at the beginning and *232 end of 1960, and the end of 1961 were: 1/1/60
12/31/60
12/31/61
Capital stock
$192,790.00
$192,790.00
$192,790.00
Condemnation award
18,789.55
18,789.55
18,789.55
Earned Surplus
492,107.85
557,257.08
648,309.87
Total
$703,687.40
$768,836.63
$759,889.42
Federal's assets, liabilities, capital, and surplus on December 31 of 1959, 1960, and 1961 were: 396 1959
1960
1961
ASSETS
Cash
$374,013.22
$431,537.86
$498,027.97
Government obligs.
1,000.00
1,000.00
1,000.00
Accounts rec.
65,669.72
73,010.58
74,547.59
Inventories
51,948.38
57,428.90
45,316.75
Securities
150,906.59
150,608.02
150,811.08
Depreciable assets, Cost
74,099.39
74,852.57
81,155.87
Less depreciation allowance
55,747.14
58,599.14
61,576.75
Net depreciable assets
18,352.25
16,253.43
19,579.12
Land
83,740.13
83,740.17
113,740.13
Other assets
117.56
126.48
124.95
Total Assets
$745,747.85
$813,705.44
$903,147.59
LIABILITIES, CAPITAL, SURPLUS
Accounts payable
$ 29,587.37
$ 31,460.53
$ 28,820.42
Accrued payroll
12,473.08
13,408.28
14,437.75
Surplus reserve - Condemnation award
18,789.55
18,789.55
18,789.55
Capital stock
192,790.00
192,790.00
192,790.00
Earned surplus
492,107.85
557,257.08
648,309.87
Total Liabilities & Capital
$745,747.85
$813,705.44
$903,147.59 Federal's assets, liabilities, capital and surplus on December *233 31, of 1962, 1963, 1964, and 1965 are set forth below: 1962
1963
1964
1965
ASSETS
Cash
$542,715.52
$614,380.37
$682,114.81
$756,631.43
Govt. Obligs.
1,000.00
1,000.00
1,000.00
1,000.00
Accts. rec.
88,101.32
102,540.55
102,867.57
126,758.27
Inventories
56,373.93
59,311.93
62,966.00
44,569.74
Securities
148,228.02
141,872.52
136,665.50
136,655.90
Net deprec. assets
18,575.94
16,393.46
14,115.65
12,244.83
Land
113,740.13
113,740.13
113,143.23
111,137.23
Prepd. exp.
122.97
131.08
132.00
149.36
Total assets
$968,857.83
$1,049,370.04
$1,113,004.76
$1,189,146.76
LIABILITIES
Accts. payable
$ 36,282.19
$ 29,033.84
$ 31,044.97
$ 32,562.74
Accd. payroll
11,625.07
13,843.91
13,296.10
12,637.45
Condem. award
18,789.55
18,789.55
18,789.55
18,789.55
Cap. stock
192,790.00
192,790.00
192,790.00
192,790.00
Earned surplus
709,371.02
794,912.74
857,084.14
932,367.02
Total liab. & cap.
$968,857.83
$1,049,370.04
$1,113,004.76
$1,189,146.76 397 Federal's earned surplus and undivided profits increased from $400,033.83 at the end of 1955 to $648,309.87 at the end of 1961, which increase was the net amount of $248,276.04. In 1958, there was an unexplained decrease of $37,026.38. The following schedule (prepared from the balance sheets) shows the annual increase in earned surplus in each *234 of the years 1956-1961, and the balance at the end of each year 1955-1961: Federal's Earned Surplus
and Undivided Profits
Year
Increase
Balance
1955
$400,033.83
1956
$20,903.27
420,937.10
Federal's Earned Surplus
and Undivided Profits
Year
Increase
Balance
1957
$64,166.31
$485,103.41
1958
(37,026.38)
448,077.03
1959
44,030.82
492,107.85
1960
65,149.23
557,257.08
1961
91,052.79
648,309.87
Federal's earned surplus and undivided profits increased from $648,309.87 at the end of 1961, to $932,367.02 at the end of 1965, which was an increase of $284,057.15. Federal's assets, liabilities, capital and surplus at the end of the years 1955-1958 were: 1955
1956
1957
1958
ASSETS
Cash
$379,471.27
$376,303.90
$432,827.19
$356,003.09
Government obligs.
0
0
0
1,000.00
Accounts rec.
41,273.67
39,589.76
44,992.43
58,770.25
Inventories
29,556.09
33,257.94
36,112.44
35,308.65
Securities
137,292.12
151,777.46
151,495.46
150,859.37
Depreciable assets, Cost
73,496.98
84,201.39
85,510.03
73,784.20
Less deprec. allow.
44,947.47
48,399.96
51,913.30
53,059.73
Net deprec. assets
28,549.51
35,801.43
33,596.73
20,724.47
Land
99,474.49
99,528.50
99,528.50
81,646.37
Other assets
142.40
92.20
108.80
106.80
Total Assets
$715,759.55
$736,351.19
$798,661.55
$704,419.00
LIABILITIES, CAPITAL,
SURPLUS
Accounts payable
$ 31,270.29
$ 32,201.57
$ 28,913.60
$ 30,730.14
Accrued payroll
14,299.57
13,056.66
14,488.68
14,032.28
Surplus reserve -
77,365.86
77,365.86
77,365.86
18,789.55
Condemnation award
Capital stock
192,790.00
192,790.00
192,790.00
192,790.00
Earned surplus
400,033.83
420,937.10
485,103.41
448,077.03
Total Liab. & Cap.
$715,759.55
$736,351.19
$798,661.55
$704,419.00
*235 Federal's income, or profit and loss, statements for the years 1955-1959, inclusive, are incorporated herein by reference. They show that in each of these 5 years, a substantial part of its income was from sources other than its foundry and metal business, i.e., from dividends, interest on bank deposits, and capital gains. The following schedule shows the gross and net profit from the foundry business, income from other sources, and income taxes paid: 1955
1956
1957
1958
1959
Bus. income:
Gross profit
$31,506.11
$12,739.11
$34,651.13
$32,599.30
$17,747.97
Deductions
5,544.15
8,998.75
8,412.18
50,097.30
8,300.74
Net bus. income
$25,961.96
$ 3,740.36
$26,238.95
($17,498.00)
$ 9,447.23
Dividends
$20,864.81
$23,204.45
$26,194.66
$26,847.98
$ 27,037.25
Interest
4,119.06
4,254.61
11,500.61
10,937.08
9,700.42
Cap. gain
2,934.06
1,376.18
265.92
25,877.10
1,188.60
Misc.
3,070.49
3,147.43
4,697.14
3,300.41
3,356.61
Other income
$30,988.42
$31,982.67
$42,658.33
$66,962.57
$41,282.88
Total net
$56,950.38
$35,723.03
$68,897.28
$49,464.57
$50,730.11
income
Inc. tax pd.
$14,099.75
$ 4,730.97
$18,676.75
$ 6,699.29
$ 8,608.27 398 In 1958, Federal realized taxable capital gain of $25,877.10. It also deducted interest in the amount of $39,983.15. These items, the *236 largest in each category during the period 1955 through 1961, are not explained. For the 21 years 1941 through 1961, Federal's foundry and metal business produced gross sales and gross profit in the following gross amounts: Year
Gross Sales
Gross
Profit
1941
$37,865.37
**
1942
45,447.52
**
1943
22,537.04
**
1944
26,559.69
**
1945
22,097.35
**
1946
31,999.35
**
1947
76,835.28
$ 40,496.29
1948
86,632.09
37,856.09
1949
90,436.64
40,859.61
1950
67,410.11
21,740.52
1951
27,589.59
5,933.46
1952
$30,368.86
$ 8,643.72
1953
39,483.60
16,327.07
1954
40,401.97
18,652.10
1955
72,282.91
31,506.11
1956
42,243.40
12,739.1 1
1957
79,663.57
34,651.13
1958
81,567.44
32,599.30
1959
51,827.23
17,747.97
1960
101,417.92
41,219.75
1961
104,667.18
44,658.86
The not profit from Federal's foundry business operations in the 21 years 1941 through 1961 were as follows: Business
Operations Net Year
Profit
1941
$ 4,897.54
1942
4,967.19
1943
(1,347.99)
1944
( 436.57)
1945
3,640.61
1946
7,644.50
1947
36,121.72
1948
33,589.64
1949
36,481.16
1950
18,041.91
1951
3,536.27
1952
$ 5,754.65
1953
13,203.00
1954
15,936.25
1955
25,961.96
1956
3,740.36
1957
26,230.95
1958
* *237 22,485.15
1959
9,447.23
1960
32,267.61
1961
33,688.54
Federal's business receipts, net business income, income from securities and other sources, and taxable income for the 4 years 1962 through 1965 are set forth below. The profit and loss statements involved are incorporated herein by reference: 1962
1963
1964
1965
Bus. income:
Gross receipts
$116,985.84
$167,515.
27,446.96
$139,364.91
Gross profit
47,909.38
83,238.
68,262.26
74,849.13
Deductions
14,277.99
16,720.
23,247.26
22,966.43
Net bus. inc.
$ 33,631.39
$ 66,518.
45,015.00
$ 51,882.70
Dividends
$ 23,279.43
$ 23,101.
24,530.81
$ 26,293.18
Interest
12,803.27
13,060.
14,602.80
15,902.71
Cap. gains
8,472.64
8,471.
28,989.17
14,367.47
Other
6,627.77
242.
369.40
335.98
Total other inc.
$ 51,183.11
$ 44,875.
68,492.18
$ 56,899.34
Total net inc.
$ 84,814.50
$111,393.
13,507.18
$108,782.04
Spec. deduct.
19,787.52
19,635.
20,851.19
22,290.20
Difference
$ 65,026.98
$ 91,758.
92,655.99
$ 86,491.84
Tax pd.
$ 26,026.58
$ 40,017.
* 13,590.70
$ 33,211.57 399 The following table sets forth the cash on hand and the securities listed among Federal's assets on its balance sheets as of the end of each year 1955 through 1965: End of Year
Cash
Securities Owned
1955
$379,471.27
$ 137,292.12
1956
376,303.90
151,777.46
1957
432,827.19
151,495.46
1958
356,003.09
150,859.37
1959
374,013.22
150,9 06.59
1960
431,537.86
150,608.02
1961
498,027.97
150,811.08
1962
542,715.52
148,228.02
1963
614,380.37
141,872.52
1964
682,114.81
136,665.50
1965
756,631.43
136,655.90
The *238 following schedule lists the stocks and bonds owned by Federal during the taxable years, and their approximate market value in October 1962: Name
No. of
Date of Purchase
Federal's
Approx.
Shares
Basis
Mkt.Val. Oct.
'62
Amer. Mutual Fund
13
(Dist. Bareco, '46)
$ 0.00
$ 104.00
Avildson Tool Co.
100
1946
437.50
N.A. * *239 Bucyrus Erie
120
1948
1956
2,357.60
1,800.00
Byers, A.M., Co., com.
300
1949
6,036.75
2,850.00
Foremost Dairies Co.,
300
1948
1,172.09
3,600.00
com.
Foremost Dairies Co.,
6
(on com., 1960-61)
0.00
240.00
4-1/2 pfd.
Flintkote Co. com.
1084
1943
2,209.28
27,100.00
Gladding McBean & Co.
3954
1948-1949
7,173.26
83,000.00
Laher Spring & Tire
160
1945
4,240.00
N.A. *
Co., pfd.
McCloud RiverLumber
276
1946
9,798.00
23,300.00
Co.
Orpheum Bldg. Co.
2859.6
1935-1949
4,148.87
11,400.00
Pacific Cement & Agg.,
1574
1942-1948
4,064.65
18,101.00
com.
Pacific Lumber Co.
200
1935
1,504.46
54,600.00
River Farms Co.
500
1946
5,750.00
N.A. *
Sheraton Corp., com.
388
1943
337.50
4,074.00
$49,229.96
U.S. Treasury Bond
$1,000
1943
1,000.00
$50,229.96
$230,169.00
In Sutro & Co. Stock
Account:
Atlas Corp. com.
891
1939
$ 0.00
$ 2,227.50
Bank of America
54
1937
550.00
2,727.00
Byers, A.M., pfd.
10
1938
255.51
95.00
Cincinnati Gas & Elec.
56
1946-1949
702.88
2,590.00
Columbia Gas & Elec.
186
1937
2,523.06
4,650.00
com.
Gladding McBean & Co.
4672
1937-1940
6,170.25
98,000.00
Firstamerica Corp.
50
(Dist. Trans. Am.
0.00
1,400.00
(later Western Bank)
Co.) 1958
Foremost Dairies, Inc.
1500
1936-1938
3,710.50)
com.
Foremost Dairies, Inc.
7
(Dist. on com.,
0.00)
4-1/2 pfd.
1960-61)
Foremost Eqpt. &
150
(Dist. on com.,
0.00)
18,000.00
Finance
1960-61)
Pac. Cement &
267
1947-48
1,515.06
3,070.50
Aggregates, com.
Pac. Gas & Elec. Co.
550
1937-1958
17,644.83
15,950.00
Sheraton Corp., com.
1547
1936-1940
2,438.00
16,243.50
Sinclair Oil Co.
1200
1929-1942
19,507.50
46,200.00
Transamerica Corp.
50
1937
917.50
1,850.00
Union Oil Co. of Cal.
1000
1928-1929
33,417.88
52,500.00
Sinclair Oil Debenture
1956
13,300.00
N.A. *
4-3/8 due 1986
$102,652.97
$265,503.50
GRAND TOTAL
$495,672.50
Federal maintained savings accounts in several banks during the years 1954 through 1961, and commercial accounts with 2 banks, Bank of America and Wells Fargo Bank. The following schedules show the balances in Federal's bank accounts on December 31 of each year. The year's interest, which is included in the year-end balance of each savings account is shown separately, if known (otherwise noted as not known. "N.K."): Federal; Savings
Accounts.
Banks
1954
Int.
1955
Int.
Bank of Am.
$ 2,133.77
$ N.K.
$ 2,133.77
$ N.K.
United Calif.
227,286.36
3,781.06
230,708.43
3,422.07
Wells Fargo
16,000.00
246.14
16,000.00
239.99
First West., Oak.
5,200.00
N.K.
Total
$245,420.13
$4,027.20
$254,042.20
$ 3,662.06
Federal; Commercial Bank
Accounts.
Bank of Am.
$ 87,228.00
$119,584.00
Wells Fargo
1,476.00
2,776.00
Total
$ 88,704.00
$122,360.00
Federal; Savings
Accounts. Banks
1956
Int.
1957
Int.
Bank of Am.
$ 2,133.77
$ N.K.
$ 94,918.49
$ 2,784.72
United Calif.
234,694.76
3,473.60
246,724.47
7,238.47
Wells Fargo
16,000.00
240.01
16,000.00
459.61
First West., Oak.
5,304.00
104,00
Total
$258,132.53
$3,817.61
$357,642.96
$10,482.80
Federal; Commercial Bank
Accounts.
Bank of Am.
$112,459.00
$ 68,322.00
Wells Fargo
3,186.00
3,718.00
Total
$115,645.00
$ 72,040.00
Federal; Savings
Accounts.
Banks
1958
Int.
1959
Int.
Bank of Am.
$ 82,562.39
$2,643.90
$ 85,057.82
$ 2,495.43
United Calif.
196,746.23
6,567.12
202,416.49
5,670.26
Wells Fargo
301.15
Hibernia
28,118.40
278.40
28,968.27
849.87
Total
$307,427.02
$9,790.57
$316,442.58
$ 9,015.56
Federal; Commercial Bank
Accounts.
Bank of Am.
$ 44,402.00
$ 53,433.00
Wells Fargo
1,117.00
1,117.00
Total
$ 45,519.00
$ 54,550.00
Federal; Savings
Accounts
Banks
1960
Int.
1961
Int.
Bank of Am.
$ 87,628.66
$2,570.84
$ 90,287.24
$ 2,658.58
United Calif.
208,594.51
6,820.26
215,055.09
6,520.58
Hibernia
29,843.82
375.55
30,479.23
905.41
Total
$326,066.99
$10,266.65
$335,821.56
$10,084.57
*240 401 Federal; Commercial
Bank Accounts.
Bank of Am.
$101,224.00
$141,519.00
Wells Fargo
1,287.00
1,287.00
United Calif.
16,000.00
Total
$102,511.00
$158,806.00
From 1919 until June 1951, Federal's plant was located at 1890 Sixteenth Street, San Francisco, where it owned the property. The property was acquired by a public authority in 1951 in a condemnation proceeding because it was located in the area of lands to be converted into a public highway and freeze system. Federal moved its plant to Sausalito, Marin County, where it purchased a tract of 8 1/2 acres, for which all of the purchase price was paid outright. According to its balance sheets for 1955-1961 Federal has owned real property costing as much as $99,474.49, in 1955, and $83,740.13, in 1960 and 1961. It received $89,000 for the property in San Francisco. The area of that land was 100 by 214 square feet. The property was located in San Bruno in the south part of San Francisco near the Seal Stadium and the beginning of what is now the Bayshore Freeway. In 1951, Federal purchased the 8 1/2 acres of land in the City of Sausalito for $110,000 in cash, outright. This property consists of 2 parcels which are not contiguous but are connected *241 by an easement or right-of-way of 30 or 40 feet. One parcel is 6 1/2 acres; the other is 2 acres. Federal's plant is located on the 2-acre tract. The 6 1/2-acre tract, lot 28, is vacant and unimproved except for some concrete footings and wood piles that were put in by the previous owner. The footings are covered with concrete slabs and are in good condition. A spur railroad track runs along the east side of the property; the frontage extends more than 500 feet along Bridgeway, the main street running through Sausalito. When Federal acquired the property, there was a building on the 2-acre piece of land. The area of the building is 100 by 200 feet, and it is 40 feet high. The original material used in the construction of the building is "outside" plywood. It was built in 1944, during World War II, by the United States Government, which either owned or controlled all of the 8 1/2 acres. Federal covered this building with aluminum, on all sides and on the roof. Although the basic construction of the building is called "outside plywood", Federal's president, Tiscornia, testified that it is "heavy wood construction", covered with aluminum, and is "a heavy well-built building". One side *242 of the building is a large area with "a chain block in it" which can support a weight of from 1,000 to 2,000 pounds. The chain block was installed by the Government. The building is one-story throughout. Three or four offices are located in a partitioned area. In another area there are bins. There is a second building on the 2-acre piece of land, 40 by 40 feet. Federal's foundry is located in the second, smaller building. In the larger building, Federal has its machinery, inventory, parts, patterns, the chain block, and space for its automobiles. On its balance sheet, in its tax return for 1960, Federal listed land at $83,740.13; and its buildings and fixed depreciable assets at $74,099.39, on which the accumulated depreciation in prior years was $55,747.14, leaving a balance of $18,352.25. Schedule G. Depreciation, in Federal's tax returns for 1960 and 1961 are as follows: 402 1960
Property
Cost orBasis
Deprec.
Rate
Deprec.
Allowed
1960
Woo d & metal bldg.
$15,789.40
$ 5,242.71
5%
$ 789.47
Machines, equip.
40,572.48
33,425.73
10%
1,780.54
Foundry
1,791.94
1,791.94
0
Furn. & fixt.
3,042.06
2,997.82
10%
8.25
Tools
5,526.20
4,984.77
10%
43.97
Patterns
4,100.28
3,273.96
20%
229.17
Autos
4,030.21
4,030.21
Total
$74,852.57
$55,747.14
$2,851.40
1961
Wood & metal bldg.
$16,098.48
$ 6,032.18
5%
$ 839.47
Machines, equip.
45,391.15
35,206.27
10%
1,774.79
Foundry
1,791.94
1,791.94
Furn. & Fixt.
3,248.06
3,006.67
10%
29.45
Tools
6,404.82
5,028.74
10%
107.99
Patterns
4,191.21
3,503.13
20%
225.91
Autos
4,030.21
4,030.21
Total
$81,155.87
$58,599.14
$2,977.61
*243 In 1960 and 1961, and before and after those years, Federal was not and is not insured for fire. There never has been a fire at the Sausalito property. There has not been an appraisal of the replacement cost of the building and equipment. Federal did not, and does not, carry on its books any account entitled "Reserve for Self-Insurance". Although there was a change in the zoning, by the City of Sausalito, in 1963, in the area where Federal's property is located, it did not affect the use of the property by Federal, as the zoning of the area still allows industrial use and activity within the newly zoned area. Federal never has developed any written or specific plans for the future development of its 6 1/2-acre tract, or its other 2-acre property, in Sausalito. The growth and development of Sausalito, as of 1960 and 1961, have made the most profitable, future, development and use of Federal's 2 tracts of land that of commercial or residential development, rather than that of industrial use and development. The volume of Federal's foundry and metal business in 1960 and 1961 is indicated by its report in its tax returns for those years of the costs of goods sold, as follows: 1960
Inventories, Jan. 1, 1960
$21,413.65
Mchdse. bought for mfr. & sale
28,487.79
Total
$49,901.44
Less inventories Dec. 31, 1960
15,301.08
$34,600.36
Jobs in process, Dec. 31, 1960
$40,213.11
Jobs in process, Jan 1, 1960
28,580.11
Difference
$11,633.00
1961
Inventories, Jan. 1, 1961
$15,301.08
Mchdse. bought for mfr. & sale
15,144.34
Total
$30,445.42
Less inventories Dec. 31, 1961
12,438.30
$18,007.12
Jobs in process Jan. 1, 1961
$40,213.11
Jobs in process Dec. 31, 1961
31,206.92
Difference
$ 9,006.19
*244 403 The Bank of America has been an important customer of Federal for many years, if not its principal one. In 1960, 80 percent of Federal's sales, and in 1961, 70 percent of sales, were attributable to that bank. This business relationship extends back to 1919. Federal makes for and sells to the Bank of America standard metal fixtures which are installed at many of the bank's branch offices. Continental Service Company is a subsidiary of the Bank of America corporation, and handles the management of the bank's properties, and the bank's architectural work, and supervises all of the bank's construction work. Federal dealt with Continental Service when working on jobs for the bank. Federal has the only patterns for some of the standard items used by the Bank of America. However, the jobs contracted by the bank are negotiated by the bank's representatives, or Continental's representatives, and there are competitors of Federal. Therefore, Federal's prices in its negotiations for jobs for the bank must be, and have had to be, comparable to the prices of competitors in order that Federal might receive orders for the bank's work. In 1963 or 1964, Federal completed a large job for the Bank *245 of America at its Powell Street-Market Street branch in San Francisco. The price paid to Federal was about $30,000. The Bank of America commenced in 1966 the foundation work for its new and very large headquarters building in San Francisco in the area of Kearny and California Streets. This building will be known as the bank's world headquarters office building. However, the plans and specifications for all of the work to be done inside of this new building had not been completed up to and as of and before October 1966. Although, as of October 1966, Tiscornia, as Federal's president, expected that Federal would receive, at some time in the future, from the Bank of America (or Continental Service Corporation) contracts to make and install ornamental bronze, or other ornamental metal, fixtures in the new world headquarters building (when the time for that interior work arrived), provided Federal's prices were fair and reasonable, no contracts for such prospective work had been negotiated, or even had been planned or prepared by Federal and the Bank of America, in 1960 or 1961, or thereafter up to and including October 1966. In 1953, Federal received a commitment from Carl F. Wente, then *246 president of the Bank of America, which confirmed a prior verbal agreement with L.M. Giannini, a former president of the bank. Federal had acquired certain property, located in San Francisco in the block bounded by Pine, Kearny, California, and Montgomery, for the benefit of the bank. The bank agreed to award Federal the contract for the metal work in its line, at a price which would be fair and reasonable, for the world headquarters building. When Federal sold a parcel of land in San Francisco in 1953 to the Bank of America, the president of the bank sent Federal the following letter dated September 3, 1953: Confirming the verbal agreement had with L.M. Giannini while he was President of the Bank of America National Trust and Savings Association regarding the acquisition of the property hereafter described, by your company for the benefit of the Bank, it is agreed that when and if the Bank erects, directly or indirectly, a building or buildings on the property in the block bounded by Pine Street on the east, Kearny Street on the west, California Street on the north, and Montgomery Street on the south, * * * the Federal Ornamental Iron and Bronze Company be awarded the contract for *247 the metal work in its line, at a price which is fair and reasonable. Federal Mail Chute Corp., Ltd. Federal has been, since 1929, and still is the controlling shareholder of Federal Mail Chute Corp., Ltd., a subsidiary. Mail Chute Corp. contracts, under competitive bidding (except for jobs received from certain banks on a negotiated basis), for the manufacture and installation of mail chutes and mail receiving boxes, for installation in large office buildings, public buildings, and similar buildings, as authorized by the United States Post Office Department. The mail chutes and mail boxes are and have been manufactured and installed by Federal, the petitioner since 1929. Mail Chute Corp. is one of the three (only) concerns in the entire United States which arranges for the manufacture of receiving boxes for mail, and mail chutes, which are approved by the United States Post Office Department. Mail Chute's patent expired in about 1945. Mail Chute does not have any out-of-state representative. Its business is carried on only in California. It is the smallest of the 3 companies authorized by the Post Office Depa-tment to manufacture mail 404 chutes. Federal, the petitioner, constructs *248 the mail chutes and mail boxes for Mail Chute. The schedule of income, assets and liabilities shows that Mail Chute Corporation had a relatively small business in 1960 and 1961. Mail Chute's gross and taxable income in 1960 and 1961 were: 1960
1961
Gross income
$12,297.48
$3,253.70
Net taxable income
779.95
671.97
The following data shows the small volume of Mail Chute's business in 1960 and 1961: Federal Mail Chute Corp.
1960
1961
Gross receipts
$12,297.48
$3,253.70
Cost goods sold
11,961.72
3,016.49
Gross profit
$ 335.76
$ 237.21
Interest
559.19
578.27
Total income
$ 894.95
$ 815.48
Less:
Taxes & exp.
115.00
143.51
Taxable income
$ 779.95
$ 671.97
Fed. inc. tax
$ 233.99
$ 201.59
Assets at Dec. 31
1959
1960
1961
Cash
$39,776.96
$50,699.55
$58,200.93
Rec'bls.
2,623.50
4,091.00
45.60
$42,400.46
$57,790.55
$58,246.53
Liabilities
Accts. payable
$34,289.20
$46,190.92
$49,208.92
Cap. stock [1,500 shares held in escrow in each year] Earned surplus [not known] The mail chute business of Federal Mail Chute Corp. has been unsuccessful. A.A. Tiscornia A.A. Tiscornia was born in California in 1884, and he attended schools in San Francisco. He was a member of the Bar of the State of California; he practiced law in San Francisco; he made long-range *249 investments in real estate in San Francisco and its vicinity which proved to be very profitable. He was very successful in his investments in corporate bonds and stocks. He understood very well the practical 405 aspects of making investments in real estate and securities. He was a vigorous and highly intelligent man; he was highly successful in his business interests, as well as the practice of law; and had many good friends among his business associates. In 1956, Tiscornia's investment in shares of stock of a lumber company in California "matured"; that is to say, he received in cash his equity interest in the lumber company. He received the net amount of $650,000 for about 700 shares of stock, and realized long-term capital gain of about $360,000. He did not reinvest the proceeds. He deposited them in savings accounts in banks. At the end of 1956, the total sum of his savings accounts was $960,927.69. In 1954, Tiscornia received a check for $400,000, from the New York Athletic Club for bonds of that corporation that he owned. The Club went through a refinancing and sent him its check in the above amount. Tiscornia and a vice-president of the United California Bank, Frank Chiappari, *250 were friends. Chiappari told Frank Belgran, the vice-president of Transamerica Corporation, about Tiscornia's receipt of $400,000 in cash. The United Bank of California formerly was known as First Western. Coates, the then president of First Western, discussed with Tiscornia the matter of Tiscornia's depositing his funds in the First Western Bank. It was understood that Tiscornia was the president, a director, and controlling stockholder of Federal. The officers of these various banks, who discussed obtaining deposits of Tiscornia's funds, were advised by Tiscornia that Tiscornia expected those banks to do business with Federal, if Tiscornia maintained deposits of his own, personal funds in the banks; and Tiscornia believed that it would be "good business" and would be helpful to Federal if he, as well as Federal, maintained large cash accounts in the banks which were in a position, or would be in a position later, to award contracts to Federal for ornamental bronze and metal fixtures. Accordingly, Tiscornia deposited the $400,000 received from the New York Athletic Club in savings accounts in several banks. At the end of 1954 and 1955, Tiscornia's balances in savings accounts in Bank *251 of America, First Western (later called United California Bank), and Security First National Bank aggregated $351,059.53, and $833,302.88, respectively. The following schedules show the balances, at the end of each year, 1954 through 1961, of Tiscornia's savings accounts and commercial account in the Bank of America, and, also, the amount of each year's interest on each savings account which was included in the balance at the end of the year. Tiscornia; Savings
Accounts.
Banks
1954
Int.
1955
Int.
Bank of Am.
$ 240,629.42
$ 4,661.54
$ 527,319.67
$10,390.25
United Calif.
63,662.16
1,675.64
255,216.14
4,773.98
Sec. 1st Nat.
40,767.95
639.02
50,767.07
819.42
Total
$ 351,059.53
$ 6,976.20
$ 833,302.88
$15,983.65
Tiscornia; Commercial Account.
Bank of Am.
$ 107,019.00
$ 53,064.00
Tiscornia; Savings
Accounts.
Banks
1956
Int.
1957
Int.
Bank of Am.
$ 551,179.75
$10,660.08
$ 635,555.96
$18,298.83
Crocker
51,511.25
1,511.25
Hibernia
10,075.00
75.00
Sec. 1st Nat.
51,787.48
1,028.41
28,352.74
1,565.26
United Calif.
357,960.46
6,096.32
574,824.79
16,865.33
Farmers
35,065.00
* 65.00
Wells Fargo
20,604.50
604.50
Total
$ 960,927.69
$17,784.81
$1,355,989.24
$38,985.17
Tiscornia; Commercial Account.
Bank of Am.
$ 64,788.00
$ 54,988.00 406 Tiscornia; Savings
Accounts.
Banks
1958
Int.
1959
Int.
Bank of Am.
$ 708,401.73
$20,009.84
$ 772,188.10
$ 22,655.07
Crocker
53,068.15
1,556.90
54,672.13
1,603.98
Hibernia
10,379.51
304.51
10,693.21
313.70
Sec. 1st Nat.
29,209.69
856.95
30,092.52
852.83
United Calif.
612,498.82
17,674.07
631,011.53
18,512.71
Farmers
36,124.82
1,059.82
37,216.69
1,091.87
Wells Fargo
21,227.24
622.74
21,868.80
641.56
Total
$1,470.910.01
$42,084.83
$1,557,742.98
$45,671.72
Tiscornia; Commercial Account.
Bank of Am.
$ 37,735.00
$ 50,679.00
Tiscornia; Savings
Accounts.
Banks
1960
Int.
1961
Int.
Bank of Am.
$ 799,164.58
$23,366.37
$ 823,410.48
$24,245.90
Crocker
56,324.59
1,652.46
58,030.19
1,705.60
First Western
36,917.74
715.67
Hibernia
11,016.39
323.10
11,350.62
334.23
Sec. 1st Nat.
31,003.75
911.23
31,947.63
943.88
United Calif.
688,425.31
20,199.82
709,331.59
20,956.28
Wells Fargo
23,247.27
678.99
23,953.93
706.65
Total
$1,609,181.89
$47,132.32
$1,694,992.18
$49,608.21
Tiscornia; Commercial Account
Bank of Am.
$ 116,192.00
$ 64,966.00
*252 Both Tiscornia and Federal maintained large deposits in banks during the taxable years, 1960 and 1961. At the end of 1960, the balances of the savings and commercial bank accounts of Tiscornia, and of Federal (which were separate accounts, as the schedules hereinbefore show), aggregated $2,153,951.88 (1960), and $2,254,585.75 (1961). In 1960 Tiscornia's taxable income was $140,927.32, and in 1961, it was $110,600.75. The applicable surtax rate, for each year, was 89 percent. For the years 1955-1961, Tiscornia's gross income, his net taxable income after deductions, his tax-free income, and the income taxes that he paid were as are shown in the following schedules. In 1960 and 1961, Tiscornia was in the 89 percent Federal income tax bracket and the 7 percent California income tax bracket. His income statements for the years 1955 through 1961 are: 1955
1956
1957
1958
Taxable Income
Devidends
$ 61,595.17
$ 60,230.07
$ 65,435.54
$ 65,126.68
Interest:
Corp. bonds
10,190.19
8,185.15
7,860.13
4,878.61
Notes
10,407.56
15,359.86
6,962.73
3,227.15
Bank Interest
15,983.65
17,765.86
38,979.17
42,044.71
Net Capital Gains
39,169.55
363,193.96
51,964.27
39,985.03
Rents (gross)
25,797.92
24,208.00
37,040.46
33,809.18
Exp. Allow., Federal
1,800.00
1,800.00
1,800.00
1,800.00
Other
846.40
60.00
100.00
100.00
Farm Rents, net
TOTAL
$165,790.44
$490,802.90
$210,142.30
$190,971.36
Farm Profit
$ 2,876.54
$ 2,698.32
$ 3,657.71
$ 1,133.73
Taxable Income
After Deductions & Exemptions
$ 97,102.93
$424,314.61
$131,158.41
$106,848.02
Tax paid:
Ordinary Income
$ 32,770.04
$ 34,407.41
$ 49,567.25
$ 39,673.13
Capital gains
19,584.78
181,596.98
25,982.13
19,992.52
$ 52,354.82
$216,004.39
$ 75,549.38
$ 59,665.65
Tax Free Income
$ 210.00
$ 4,811.44
*253 1959
1960
1961
Taxable Income
Devidends
$ 65,513.63
$ 69,200.79
$ 55,669.25
Interest:
Corp. bonds
3,564.72
2,285.57
8,071.80
Notes
4,876.19
2,843.40
467.42
Bank Interest
45,671.72
47,132.32
48,901.86
Net Capital Gains
55,604.11
48,205.33
18,259.58
Rents (gross)
37,502.62
44,887.50
47,349.75
Exp. Allow., Federal
1,800.00
1,800.00
1,800.00
Other
80.00
80.00
80.00
Farm Rents, net
198.57
780.45
5,345.30
TOTAL
$214,811.56
$217,215.36
$185,944.96
Farm Profit
Taxable Income
After Deductions & Exemptions
$138,372.81
$140,927.32
$110,600.75
Tax paid:
Ordinary Income
$ 52,545.72
$ 60,988.13
$ 60,656.82
Capital gains
27,802.05
24,102.67
9,129.79
$ 80,347.77
$ 85,090.80
$ 69,786.61
Tax Free Income
$ 1,820.51
$ 6,434.02
$ 7,300.73 407 Section 531, 1954 Code On July 16, 1964, Federal was notified by certified mail, by the respondent, that the respondent proposed issuing a statutory notice of deficiency for 1960 and 1961 in which a proposed accumulated earnings tax would be determined under section 531, 1954 Code, for 1960 and 1961. A timely "Statement of Grounds Together with Supporting Facts" was submitted by Federal to the respondent. Ultimate Findings 1. The statement filed by petitioner under section 534(c) of the Code, setting forth alleged grounds for *254 accumulating the earnings of the taxable years, did not set forth sufficient facts to show the basis of each asserted ground and, therefore, the burden of proof with respect to each of the asserted grounds did not become a burden of proof of respondent. 2. There was not a reasonable need at the end of 1960 and 1961 for petitioner to accumulate the earnings of each taxable year for the operations of its metal fixtures business, or of the business of its subsidiary, Federal Mail Chute, or for the reasonably anticipated needs of the business of Federal and of its subsidiary, Federal Mail Chute. 3. Each one of the claimed grounds for the accumulations of the earnings of the taxable years was based upon a plan or contention which, at the end of each taxable year, was not a specific, definite, and feasible plan for the projected use of accumulated earnings within a reasonably definite time in the future; and was vague, generalized, without substance, and related to only the possible use of accumulated earnings at an indefinite time in the future. 4. Petitioner's accumulated earnings at the end of 1959 were sufficient, without implementation by any additional accumulation of the earnings *255 of the taxable years, to provide for the needs of petitioner's business, and of the business of its subsidiary, as those businesses existed at the end of the taxable year; and to provide for (1) a "reserve" for a fund for self-insurance against fire; (2) for an anticipated contract with Bank of America for its new headquarters building; and (3) for the reasonably anticipated future needs of the businesses as they existed on the basis of facts at the end of the taxable years. 5. Petitioner failed to prove that it did not permit its earnings for the taxable years to be accumulated beyond the reasonable needs of the business for the purpose of avoiding the income tax with respect to its shareholders. Petitioner was availed of at the end of each taxable year for the proscribed purpose. 6. The petitioner failed to prove, and the evidence does not support a finding, that during and at the end of 1960 and 1961 it required or needed, in order to obtain contracts and orders from banks in the taxable years and the foreseeable future, the assistance of Tiscornia's savings accounts in banks, the total balances of which amounted to $1,609,181.89 at the end of 1960, and $1,694,992.18 at the end *256 of 1961. There is no credible evidence that any of petitioner's business from banks in 1960 and 1961, or prior or subsequent to those years, was received as a result of Tiscornia's deposits in his own savings accounts. Petitioner did not establish that Tiscornia's maintenance of large balances in his own savings accounts was directly and proximately related to the reasonable needs and operations of petitioner's business, and was not due to the business and personal interests of Tiscornia. Opinion Section 532(a), 1954 Code, defines the corporations to which the accumulated earnings tax shall apply, and it provides that the accumulated earnings tax shall apply to every corporation which is "availed of for the purpose of avoiding the income tax with respect to its shareholders * * *, by permitting earnings and profits to accumulate instead of being divided or distributed." Section 531 imposes the accumulated earnings tax. Respondent determined that such tax, at the rate of 27 1/2 percent, shall be imposed upon the earnings of the petitioner for 1960 and 1961. The earnings for both years were accumulated. Section 533(a) states what shall be evidence of purpose to avoid income tax, as *257 follows: For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary. Section 537 states that the term "reasonable needs of the business" includes "the reasonably anticipated needs of the business." 408 The issue here is whether petitioner was availed of during 1960 and 1961 for the purpose of avoiding the income tax with respect to its shareholders within the meaning of the above statutory provisions. The petitioner's contentions are that the accumulation of its earnings in 1960 and 1961 was necessary in order to obtain jobs and contracts from banks, for its "future business needs", for the "development by the petitioner of the 6 1/2 acre parcel [of land] owned by petitioner", for self-insurance against fire, and for anticipated expenses of the development of its mail chute business, nationally, through its subsidiary, Federal Mail Chute Corp., Ltd. Petitioner contends, also, that there was no purpose to avoid *258 the income tax with respect to its shareholders by permitting the earnings for the two taxable years to be accumulated, rather than distributed. Petitioner argues that no income tax was actually avoided, particularly with respect to its principal shareholder, the late A. A. Tiscornia. Respondent contends, in general, that petitioner's earnings for 1960 and 1961 were permitted to accumulate beyond the reasonable needs of its business, including the reasonably anticipated needs of its business; and that in both of the taxable years, petitioner was availed of for the purpose of avoiding the surtax with respect to its shareholders, particularly with respect to A. A. Tiscornia. There is a question about the burden of proof under section 534. It allows the taxpayer in certain instances to shift to the Commissioner the burden of proving accumulation beyond the reasonable needs of the business. That question is discussed hereinafter. The first question to be considered is, in general, whether the accumulations of petitioner's earnings and profits for 1960 and 1961 were justified because they were required for the reasonable needs, and the reasonably anticipated needs, of petitioner's business. *259 If that general question is decided for the respondent and against the petitioner, then, under section 533(a), supra, there is the question whether the petitioner overcame, "by the preponderance of the evidence", the presumption contained in that section that the accumulations beyond the reasonable needs of the business were for the proscribed purpose of avoidance of the income tax with respect to the shareholders. With respect to the latter question, we are now guided by United States v. Donruss Co., 393 U.S. 297 (January 13, 1969). Federal's business in 1960 and 1961, and in all prior years, is and has been the manufacture and installation of metal fixtures which are installed in buildings, chiefly in the offices of banks. It also manufactures and installs metal mail chutes for its subsidiary, Federal Mail Chute Corp., Ltd., under contracts obtained by its subsidiary. Although Federal owns a parcel of unimproved land in Sausalito, 6 1/2 acres, it had not entered into any actual development of that tract of land before or during the taxable years, and it had not prepared any actual plans for such possible undertaking. For a period of 21 years, 1941 through 1961, Federal accumulated *260 its earnings and profits, and it did not declare or pay any dividends, excepting a constructive dividend of $30,000 in 1952 to Tiscornia (which is not explained). Federal did not pay any salary to Tiscornia, who was its president, director, managing officer, and controlling shareholder. At the end of 1959, the amount of Federal's accumulated earnings, profits, and surplus, on its books, was $492,107.85. Its earnings for 1960 and 1961, respectively, upon which the respondent has determined the disputed accumulated earnings tax, amounted to (after the corporation income tax) $53,262.95, and $50,788.48, or the total sum of $104,051.43. It is noted hereinafter that among Federal's assets at the end of 1959 were large amounts of cash deposited in banks, and substantial holdings of securities issued by corporations which evidently had a greater market value at the end of 1959 and during 1960 and 1961 than their cost or value on Federal's books. The reasonable needs of the business of the taxpayer, including its reasonably anticipated needs, depends in every case upon the particular facts about the nature and operation of the business involved in the case under consideration. Helvering v. National Grocery Co., 304 U.S. 282 (1938); *261 John P. Scripps Newspaper, 44 T.C. 453, 467. Apart from the reasonably anticipated needs of the business under consideration, the inquiry "must always be concerned with the needs of the particular business as they existed during the particular [taxable] year." Dixie, 409 Inc. v. Commissioner, 277 F. 2d 526, 528 (C.A. 2, 1960), cert. den., 364 U.S. 827. And as we said in Scripps Newspapers, supra, p. 467, in determining whether the taxpayer's accumulations of earnings and profits during the taxable years in issue were for the reasonable needs and reasonably anticipated needs of its business, it becomes necessary to determine whether prior accumulations were sufficient, in fact, to meet the taxpayer's needs during the taxable years. Sec. 1.535-3 (b)(1)(ii), Income Tax Regs. The reasonableness and the nature of the surplus, rather than the size or amount of the previously accumulated earnings and profits, are the crucial factors. Scropps Newspapers, supra, p. 467. Consideration is given first to some of the general facts: Federal is a closely held corporation. One of its shareholders is Mortgage Underwriting & Realty Co. Tiscornia owned 89.62 percent of its stock, and Alice Copeland, *262 an employee of Federal, owned 10.15 percent thereof. Tiscornia controlled Mortgage Underwriting, which owns 23.41 percent of the stock of Federal. Tiscornia owned 76.58 percent of the stock of Federal. Federal was controlled by Tiscornia, and he determined and controlled the policies of Federal, and was active in the arrangements and negotiations for obtaining jobs, orders, and contracts for Federal. In general, Tiscornia managed Federal but he did not ever receive a salary, and he received only a flat sum of $1,800 each year as reimbursement for his expenditures in behalf of Federal. At all times, Federal's business has been the operation of a foundry for the fabrication and manufacture of metal fixtures. At all times since 1941, at least, according to the evidence, it was the general policy that the earnings and profits of the business would be accumulated, and Federal's earned surplus and undivided profits amounted to $400,033.83 at the end of 1955, and that was increased by $92,074.02, to $492,107.85, per books, at the end of 1959. On its books and balance sheet, a condemnation award of $18,789.55 was carried as part of capital. This amount, added to earned surplus at the end of *263 1959, increased surplus to $510,897.40. Attention is given hereinafter to the way in which Federal's surplus was reflected in cash and investments. A substantial quantity of evidence was introduced by the respondent, which includes (but is not limited to) Federal's balance sheets, and its income and earnings statements for the years 1955-1961, inclusive; and schedules of the securities owned by Federal, and schedules of its deposits of cash in commercial and savings bank accounts, from the end of 1954 through 1961. The income statements show that in each year, 1955-1961, Federal's receipts of dividends from its investments in corporate securities, from interest on bank deposits in savings accounts, and its income from other sources, exceeded its net business income from its foundry and metal business. They show that during the period 1941 through 1961, its net income from the foundry and metal business was relatively small, from a low of about $3,740 in 1956, to a high of $33,688.54 in 1961; and that during the years 1941 through 1955, petitioner's net profit from its foundry business ranged from a low of about $3,3500 in 1945 and 1951, to a high of $36,481.16 in 1949. (See pages *264 7, 10, 16, and 17 of the findings.) The following schedule shows the amounts of petitioner's net business income, its income from only dividends and interest, and its income from dividends, interest, and all sources except its business, in the years 1955 through 1961 (see pages 7, 10, and 16 of the findings): 1
2
3
Net income foundry
Interest
Interest, dividends,
Year
business
& dividends
& other income *
1955
$25,961.96
$24,983.87
$30,988.42
1956
3,740.36
27,459.06
31,982.67
1957
26,238.95
37,695.27
42,658.33
1958
(17,498.00)
3 7,785.06
66,962.57
1959
9,447.23
36,737.67
41,282.88
1960
32,267.61
38,211.60
41,489.89
1961
33,688.54
35,236.53
47,858.80
The evidence introduced by the respondent includes a detailed list of the stocks and bonds owned by Federal during the taxable years and before; the dates of purchase or acquisition, Federal's cost or basis; and the approximate market values in October 1962 (see pages 19, 20 of the findings). Those assets were carried on 410 petitioner's books and balance sheets as having values at the end of 1959, 1960, and 1961 (cost or basis) *265 of $150,906.59; $150,608.02; and $150,811.08, respectively. However, the total market value thereof in October 1962 was approximately $495,672.50 (p. 20 of findings). Petitioner did not introduce evidence of the comparative total market value of all of the stocks and bonds at the end of 1959, 1960, and 1961. Lacking such evidence, and in view of the total value in 1962, it can be assumed that the total market value exceeded the book values as of the end of 1959, 1960, and 1961. Petitioner invested a substantial part of its earnings and surplus (prior to 1960) in stocks and bonds of corporations. The businesses of those corporations were not closely related to the foundry business of petitioner. In most instances they were not even remotely related to petitioner's business. (Compare petitioner's foundry business with that of businesses consisting of mutual funds investments, dairies, lumber, banking, utilities, oil, and cement, in which petitioner invested.) In section 1.537-2(c), Income Tax Regs., it is provided that (among other purposes set forth) investments of accumulated earnings and profits in properties or securities which are unrelated to the activities of the business of *266 the taxpayer corporation "may indicate that the earnings and profits are being accumulated beyond the reasonable needs of the business" of the taxpayer corporation. Petitioner received dividends from securities as follows (pp. 7, 10, 16, supra): 1955
$20,864.81
1956
23,204.45
1957
26,194.66
1958
26,847.98
1959
27,037.25
1960
27,962.32
1961
24,048.26
Total
For 1960 and 1961, the total sum of petitioner's receipts from dividends, interest, other income, and the net income from its business were as follows: Year
Dividends
Interest
Other
Foundry
business
1960
$27,962.32
$10,249.28
$ 3,278.29
$32,267.61
1961
24,048.26
11,188.27
12,622.27
33,688.54
$52,010.58
$21,437.55
$15,900.56
$65,956.15 The special deduction for dividends received, 85 percent, was $23,767.97, for 1960, and $20,441.02, for 1961. Petitioner reported income from its foundry business under an inventory method of accounting. The following schedules (from 411 the tax returns) show for 1960 and 1961 inventories at the beginning and end of the year; cost of goods sold; jobs in process at the beginning and end of the year; and gross profit before deductions, and net business income: 1960
Gross receipts, less returns
$101,417.92
Less cost of goods sold
60,198.17
Gross profit
41,219.75
Less deductions
8,952.14
Net business income
$32,267.61
Details
Inventories 1/1/61
$15,301.08
Mise. bought for mfg. & sale
15,144.34
30,445.42
Less inventories 12/31/61
12,438.30
18,007.12
Plus wages, productive labor
17,101.57
35,108.69
Plus mfg. expenses
15,894.44
51,003.13
Plus jobs in process 1/1/61
40,213.11
91,216.24
Less jobs in process 12/31/61
31,206.92
Cost of jobs completed
$60,009.32
*267 1961
Gross receipts
$104,668.18
Less cost of goods sold
60,009.32
Gross profit
44,658.86
Less deductions
10,970.32
Net business income
$33,688.54
Details
Inventories 1/1/60
$21,413.65
Mise. bought for mfg. & sale
28,487.79
49,901.44
Less inventories 12/31/60
15,301.08
34,600.36
Plus wages, productive labor
23,823.09
58,423.45
Plus mfg. expenses
13,407.72
71,831.17
Plus jobs in process 1/1/60
28,580.11
100,411.28
Less jobs in process 12/31/60
40,213.11
Cost of jobs completed
$60,198.17
The above figures and schedules indicate the amount of working capital which petitioner used (and needed) in its foundry business, its only business, in each of the taxable years. In petitioner's foundry business, petitioner manufactured metal fixtures under contracts and orders, and in that sense its business was a custom business; and it did not manufacture metal fixtures for resale as merchandise. That is to say, in its business, petitioner did not carry a large inventory of stocks of goods for resale, as such. Petitioner made fixtures according to specifications on a job basis, and each job, or contract, or order, was a complete undertaking in itself. Fixtures were made for a 412 job and then were installed. Petitioner maintained *268 some inventories of metals to be used in making particular fixtures under contracts. Although petitioner did not analyze, during the trial or on brief, the rate of its annual turnover of manufactured fixtures in the ordinary course of its foundry business, the evidence indicates that there was a rather quick turnover of manufactured goods during each year. The above schedules clearly show that condition. For example: In 1960, in the manufacture of metal fixtures, petitioner purchased materials for use in manufacturing at a cost of $28,487.79, and it used materials during the year, out of its inventories of goods and materials on hand at the beginning of the year, which cost $6,112.57, so that the cost of materials was $34,600.36. Labor expense (wages) and other manufacturing expenses totaled $37,230.81. However, the net cost of goods sold in 1960 was $60,198.17. Since gross receipts in 1960 were $101,417.92, the total cost of petitioner's business operations was more than covered by its current receipts. The same condition existed in 1961. The relationship of accounts receivable to the operations of the business in each year has not been shown, or the rate of the collections of accounts *269 receivable in each year. It appears to be evident that petitioner's annual business operations did not require the use of a large amount of capital; that the condition of petitioner's annual business operations was liquid, with a good rate of turnover of goods during the year; and that current operations of the business generated the funds for those operations. In 1960 and 1961, petitioner's liquid assets (consisting of cash, securities, accounts receivable, and inventories) totaled (per books) $713,585, and $769,703, respectively; and its current liabilities (consisting of accounts payable and accrued payroll) totaled roughly $44,000, and $43,258. In each year, the ratio of liquid assets to current liabilities was about 17 to 1. The evidence indicates that in the operations of petitioner's business in the taxable years, (and there is no evidence to the contrary), there was a good turnover of inventory, and good and almost certain collections of accounts receivable, all of which evidently provided most of petitioner's operating funds in each year. Petitioner has not argued that it had a reasonable need for an accumulation of earnings and profits in any particular amount in order to *270 cover its annual operating expenses and the total amount of its accounts receivable in a year. We have taken into account, however, the fact that petitioner's accounts receivable at the end of 1959, 1960, and 1961 amounted to roughly $65,600, $73,000, and $74,500, respectively. On the other hand, petitioner's gross receipts from its foundry business in 1960 amounted to $101,417.92; its income from dividends, interest, and all other sources amounted to $41,489.89, a total sum of $142,907.81; and the cost of goods sold was $60,198.17. In 1961, petitioner's gross receipts from its foundry business were $104,668.18; its income from dividends, interest, and all other sources was $47,858.80, a total sum of $152,526.98; and the cost of goods sold was $60,009.32. Under all of the facts and circumstances here, a ratio of 17 to 1 for liquid and current assets to current liabilities, in petitioner's business, was excessive, and it demonstrates the lack of a reasonable need to accumulate the earnings and profits of 1960 and 1961, particular in view of the large accumulation of earnings of prior years, which was $492,107.85 at the end of 1959. See Barrow Manufacturing Company v. Commissioner, 294 F. 2d 79, 81-82 *271 (C.A. 5, 1961), cert. den. 369 U.S. 817, affirming a Memorandum Opinion of this Court. The balance sheets of petitioner as of the end of 1959, 1960, and 1961 showed the assets, accounts receivable, and inventories (merchandise on hand and jobs in process), and the liabilities, accounts payable and accrued payroll, as follows: 12/31/59
12/31/60
12/31/61
Accounts rec'ble
$ 65,669.72
$ 73,010.58
$ 74,547.59
Inventories
51,948.38
57,428.90
45,316.75
Total
$117,618.10
$130,439.48
$119,864.34
Accts. pay & payroll
42,060.45
44,868.81
43,258.17
Net current assets
$ 75,557.65
$ 85,570.67
$ 76,606.17 413 From the above figures, it is clear that at the end of 1959 and 1961 the condition of petitioner's business was a liquid condition in which its current obligations were substantially less than its current accounts receivables and inventories. There is no evidence that petitioner's accounts receivable were slow or were not received and accounted for on a short-term basis. The evidence indicates that jobs and contract orders were on a relatively short-time basis. Another factor to be considered is the amount of working capital which petitioner had on hand as of January 1 of 1960, and of 1961. Petitioner's working *272 capital consisted of cash on hand, in banks, and marketable securities, which were liquid assets. Although on its books, petitioner carried its investments in securities at cost $150,906.59 at the end of 1959, and $150,608.02 at the end of 1960, the evidence indicates that the total market value of the securities was substantially larger. The evidence does not include the exact market values at the end of 1959 and 1960; but in October 1962 the total market value of petitioner's holdings of stocks and bonds was approximately $495,672.50, or more than three times the book value (cost or basis). In considering the amount of petitioner's working capital at the beginning of 1960 and 1961, effect must be given to the approximate market value of its holdings of stocks and bonds. There is no exact evidence on this point, but if it is assumed that the total market value of the stocks and bonds as of January 1, 1960, and 1961, was about three times the book value, then petitioner's working capital as of those dates was about $826,713 and $883,337, as follows: 1/1/60
1/1/61
Cash
$374,013.22
$431,537.86
Securities
452,700.00
451,800.00
$826,713.22
$883,337.86
It is clear that petitioner did not need to *273 accumulate its net current earnings in the taxable years 1960 and 1961, which amounted to $53,262.95 and $50,788.48, in order to meet the reasonable needs and to provide for the operation of its only business, its foundry metal business. Its reasonably anticipated business needs are discussed hereinafter. The evidence shows that Federal operated a going, liquid business which produced substantial funds during the year through its normal operations. The evidence does not indicate that petitioner's normal operations in each of the taxable years required in advance a large accumulation of working capital to cover one year's operations. Such factors as the nature of petitioner's business, its credit policies, the amount of inventories, and the rate of turnover, the amount of accounts receivable and the collection rate thereof, and similar factors do not indicate the need for a large accumulation of capital for the reasonable needs of petitioner's business in a year. Petitioner's customers were mainly banks and its business was specialized. It did not have any particular risks in the operations of its business. Apart from a reserve for self-insurance for fire loss, it appears that a reasonable *274 amount of working capital for the reasonable needs of petitioner's business in a year was not more than $100,000, and even less than that amount. Petitioner's contentions that it anticipated increases in its business operations and, therefore, reserves of accumulated capital are discussed hereinafter. In Smoot Sand & Gravel Corporation v. Commissioner, 274 F. 2d 495, 501, it is stated that where the accumulation of surplus is reflected in liquid assets which are in an amount in excess of the immediate or reasonably foreseeable business needs of the business that is a strong indication that the accumulations of surplus are beyond the reasonable needs of the business. In the applicable Income Tax Regs., section 1.537-1(a), it is provided that "An accumulation of the earnings and profits (including the undistributed earnings and profits of prior years) is in excess of the reasonable needs of the business if it exceeds the amount that a prudent businessman would consider appropriate for the present business purposes and for the reasonably anticipated future needs of the business. The need to retain earnings and profits must be directly connected with the needs of the corporation itself *275 and must be for bona fide business purposes." Section 1.535-3(b)(1)(ii) of the Regulations provides that "In determining whether any amount of the earnings and profits of the taxable year has been retained for the reasonable needs of the business, the accumulated earnings and profits of prior years will be taken into consideration"; and if such accumulations of prior years "are sufficient for the reasonable needs of the business, then any earnings and profits of the current taxable year which are retained will not be considered to be retained for the reasonable needs of the business." 414 At the end of 1959, petitioner's accumulated earnings and profits, according to its books, was $492,107.85. Moreover, an erroneous deduction from accumulated earned surplus of $30,000 had been made in 1958, which was restored to earned surplus in 1961. Realistically, petitioner's accumulated earnings and profits at the end of 1959 amounted to $522,107.85. As noted above, that earned surplus was reflected by liquid assets having a value of at least $826,713.22 (cash and securities). To that figure there can be added accounts receivable in the net amount of $36,082.35 (after accounts payable), plus *276 inventories of $51,948.38, (both of which reflect liquid assets), or a total amount of $88,030.73. Thus, at the end of 1959, petitioner's earned surplus per books, as adjusted, or $522,107.85, was reflected in liquid assets having a realistic value of about $914,743.95. The factors and figures discussed above establish that there was not a reasonable need in petitioner's business to retain its net earnings for either 1960 or 1961, and to add those earnings and profits to the already accumulated earned surplus as of the end of 1959. The petitioner's position with respect to the accumulations of earnings and profits to meet reasonably anticipated future needs of its business has not been argued strongly or convincingly on brief, although its president, the late A.A. Tiscornia, testified at length about the alleged future needs of petitioner's business, and other alleged needs. Our next considerations are devoted to the evidence relating to the alleged future needs of petitioner's business, as a justification for the retention and accumulation of its net earnings for 1960 and 1961. The Commissioner sent an advance notice to petitioner dated July 16, 1964, under section 534(b) of his proposed *277 determination of an accumulated earnings tax for 1960 and 1961. The petitioner filed with the Commissioner, timely, under section 534(c), a statement for the purpose of showing that the earnings of the taxable years had not been improperly retained and accumulated. In this 14-page statement, there was set forth four grounds upon which the petitioner relied in support of the retention of earnings for 1960 and 1961, as follows (stated briefly): 1. Bank deposits: That for the purpose of increasing petitioner's share of orders from banks for metal fixtures and ornamental metal work to be installed in offices of banks, petitioner had followed a policy of depositing in savings accounts in banks as large amounts of funds as it had available; and petitioner had also "required the assistance of even larger deposits by its principal shareholder [Tiscornia]." In support of this ground, there was set forth in the section 534(c) statement a narration about the alleged reasons: That petitioner's main source of jobs was orders from banks; that since the end of the Korean war, banks had been increasing the numbers of their branches and competition for bank jobs had increased; that petitioner's directors *278 had decided to seek a larger number of jobs from banks; that petitioner "had found that the only practical way to interest" banks in awarding substantial parts of their work to petitioner "on a negotiated basis", or on the basis of awarding jobs on favorable terms to "heavy depositors", was "by keeping substantial deposits in such institutions"; that petitioner's own available cash for making such bank deposits was not large enough and, therefore, its principal shareholder had deposited very substantial amounts of his own funds for the purpose of aiding petitioner in obtaining jobs from banks; and that as the result of this practice of maintaining large deposits in savings accounts, petitioner had received a majority of its jobs from the banks where it had maintained its large savings accounts. 2. Expansion of business and entering into business of constructing buildings: The second ground for retaining its earnings was stated to be the two-fold purpose of expanding and developing its metal fabrication operations and the construction of industrial buildings on the 8 1/2 acre tract of land in Sausalito which it owned. Petitioner stated, in connection with these purposes, that it was *279 obliged to accumulate its earnings for such expansion and developmental purposes because it did not have a large enough accumulated surplus for those purposes due to its having to set aside in savings accounts such a large amount of its funds in order to obtain jobs from banks. Petitioner also stated that it was holding the stocks and bonds it had purchased for $150,811 (cost or basis) with the expectation that there would be increases in the values thereof which would enable petitioner to finance, itself, its planned 415 expansion of its metal fabrication business and its intended general contruction business in developing the 6 1/2 acres of unimproved, vacant land which it owned. Petitioner stated further: That it had believed originally that a capitalization of $500,000 would be required to enable it to go into the business of constructing buildings, as well as to expand its metal fabrication business; that it regarded its investments in stocks and bonds as having the potential of increasing its capital, through increases in the values of the securities and through the dividends and interest received from the securities; that part of its need for capital was the intended development *280 and expansion of its subsidiary, Federal Mail Chute Corp.; and that it expected to undertake the construction of buildings on real estate owned by its president (Tiscornia), which was suitable for high-rise buildings. 3. Anticipated contracts for metal fixtures from Bank of America: The third ground for accumulating its earnings was stated to be that "since 1953, it has held a written agreement of the Bank of America to award to taxpayer the contract for work in its line for the building" to be built by the Bank of America in San Francisco, on Kearny, Montgomery, Pine, and California Streets; and that petitioner has held $100,000 of its funds in readiness for expenditures required for such anticipated contract, including any necessary expansion of petitioner's facilities. 4. Self-insurance for fire: The petitioner's fourth ground for accumulating its earnings was that it required a fund of at least $200,000 as its own insurance fund for fire losses, which amount represented the replacement cost of its building, machinery, tools, and inventory. In its section 534(c) statement, the petitioner also stated that its retentions and accumulations of its earnings and profits had been only *281 in order to make provisions for its business needs, growth, and development; that it had not been its intent in such accumulations to lessen the income taxes of its president and majority shareholder (Tiscornia); and that no accumulations had been permitted to remain undistributed for the purpose of preventing the imposition of income tax on any of its shareholders. Section 534(c), "Statement by Taxpayer," provides that the statement shall set forth the grounds on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business, together with facts sufficient to show the basis of the grounds relied upon. Section 534(c) provides, in effect, that the taxpayer's statement shall include statements of the supporting facts which are claimed to be evidence of the reasonableness of its retentions and accumulations of earnings. If the taxpayer's statement satisfies the requirements of section 534(c), the burden of proof, as to the grounds set forth in the statement, is upon the Commissioner. However, that burden of proof is the Commissioner's burden only with respect to the grounds set forth *282 in the statement, and only if the facts set forth in the statement are sufficient to show the basis of the ground or of each ground relied upon. Income Tax Regs., section 1.534-2(a), (b), and (d). Section 1.534-2(b)(2) of the Regulations provides that in this Court the burden of proof is upon the taxpayer, rather than the Commissioner, if "the statement does not contain facts sufficient to show the basis" of the grounds relied upon. The statement which petitioner filed with the Commissioner under section 534(c) prior to the trial of this case includes statements about the alleged future needs of the petitioner corporation in expanding its foundry business; about its maintenance of a selfinsurance fund; about maintaining a fund to provide for an anticipated contract with the Bank of America; and about an alleged plan to enter into the construction of buildings on the unoccupied part (6 1/2 acres) of its land in Sausalito, adjacent to the two-acre tract where its plant is located. All of those grounds or alleged reasons for the retention and accumulation of the earnings of the taxable years 1960 and 1961 relate to part of the chief issue, whether the earnings of the taxable years were *283 accumulated beyond the reasonably anticipated needs of petitioner's business. Petitioner's statement under section 534(c) also must be considered in connection with the question whether that statement was sufficient to shift to the respondent the burden of proof with respect to all or any of the four grounds set forth in the statement. Petitioner's statement set forth two grounds which relate to the alleged future and anticipated needs of its foundry business; one ground relating to an anticipated business of constructing buildings (a new business); and one ground relating to the 416 protection of its physical assets and business operations, self-insurance against fire. With respect to each ground, petitioner's statement did not include facts sufficient to support, and show the basis, for the ground, or reason, relied upon. To the contrary, the narrations in the statement were largely self-serving conclusions, and there is a substantial lack of statements of facts and of the dollar amounts of accumulated earnings and of funds which would reasonably and realistically be required to provide the funds for the future alleged needs of the business, and to support the alleged reasons for *284 accumulating more earnings for the purposes and reasons set forth as grounds. Our conclusions must be that the statement filed by petitioner failed to state facts sufficient to support the indicated grounds, whether or not the grounds set forth are sufficient to comply with the requirements of section 534; and that such facts as were set forth in the statement were not sufficiently clear or definite to support each asserted ground for additional accumulations of earnings, in 1960 and 1961, so as to comply with the requirements of section 534(c). The discussions hereinafter about the claimed future needs of petitioner's business explain these conclusions. See and compare Chatham Corp., 48 T.C. 145, 146, where this Court described the clear and definite facts which the taxpayer there had set forth in its statement, which this Court concluded were sufficient to support the grounds set forth for the alleged need for accumulating earnings, and sufficed to shift the burden of proof to the respondent with respect to the grounds stated. See, also, I.A. Dress Co., 32 T.C. 93, 101, affd. 273 F. 2d 543 (C.A. 2, 1960), certiorari denied 362 U.S. 976. It follows that Federal, the petitioner here, *285 had the entire burden of proof, and that a partial burden of proof was not shifted to the respondent with respect to the grounds stated in the statement under section 534(c). On the other hand, if we were to assume, arguendo, throughout our considerations, that the partial burden of proof had shifted to the respondent with respect to each one of the four grounds set forth in the statement, we would arrive at the same conclusions as are hereinafter set forth about the alleged future needs of the business, and our conclusions would be based upon and supported by the affirmative facts of record, a great many of which were established by the respondent. Therefore, the question of the shifting of part of the burden of proof to the respondent is not a significant factor in this case. See and compare Barrow Manufacturing Company, supra, p. 82. All of our conclusions with respect to the alleged reasons which petitioner claimed in the section 534 statement as justification for accumulating the earnings for 1960 and 1961 are based upon all of the relevant evidence, and such relevant evidence was in the larger part, for the most part, introduced by the respondent in his exhibits and evidence, *286 and through his examinations of witnesses at the trial. Careful consideration has been given to all of petitioner's evidence and arguments on brief. However, a great deal of the testimony of petitioner's chief witness, the late president and controlling shareholder, A. A. Tiscornia, represented conclusions and arguments, instead of proof, facts, and evidence. As much weight as is permissible has been given to Tiscornia's testimony, and we have not attempted to substitute our judgment for the business judgment of the late president of petitioner, who was the manager of its business, policies, undertakings, and plans (if any). We now consider the petitioner's contentions, and its section 534 statement (although for convenience that statement is not always mentioned), with respect to its claim that the future, reasonable needs of petitioner's business required the accumulations of its earnings for 1960 and 1961. It must be kept in mind that at the end of 1959, petitioner had accumulated earnings and profits totaling, per books, $492,107.85. However, as stated before, adjustments to that figure are supported by the evidence, and they properly may be regarded as reflecting the true amount *287 of the accumulated earnings at the end of 1959. Those two adjustments, $18,789.55 plus $30,000, or $48,789.55, increase the accumulated earnings per books at the end of 1959 to $540,897.40. Moreover, that amount of accumulated earnings was, at the end of 1959, reflected by petitioner's investments in securities having, then, a larger market value than their book value, because the values thereof had increased since the times of the purchases thereof by petitioner. The market values of the securities at the end of 1959, may have been approximately close to their market values in October 1962, which totaled 417 $495,672.50. At the end of 1959, petitioner's total cash on hand and in bank accounts was $374,013.22. That amount added to the above appreciated value of securities (as attributed to December 31, 1959) of $495,672.50, totaled $869,685.72. Therefore, the realistic view, lacking evidence to the contrary, is that at the end of 1959, petitioner's accumulated surplus, per books, as adjusted, of $540,897.40 was reflected in liquid assets having a total value of about or close to $869,685.72 (which for the purpose of this discussion does not include accounts receivable and inventories *288 at the end of 1959 (see p. 13, supra)). It is concluded that the evidence does not establish that petitioner needed in 1960 and 1961 to accumulate its earnings for each of those years in order to provide for the reasonably anticipated needs of its business, on the basis of the reasonably anticipated needs which existed at the end of 1960 and of 1961. Section 1.537-1(a), and (b)(1) and (2), Income Tax Regs. It is concluded further that petitioner's accumulated earnings and profits at the end of 1959, per books, either $492,107.85, or as adjusted, supra, $540,897.40, was sufficient and adequate to cover all of the following: the reasonable needs of petitioner's foundry business in the taxable years; a so-called "reserve" for self-insurance against fire; and the reasonably anticipated needs of petitioner's business on the basis of the facts and circumstances at the end of both 1960 and 1961. Therefore, the accumulations of earnings for each year, 1960 and 1961, was not justified. Reasonable anticipated needs of petitioner's business: Section 1.537-1(a) of the Regulations provides: (a) In general. The term "reasonable needs of the business" includes the reasonably anticipated needs *289 of the business. An accumulation of the earnings and profits (including the undistributed earnings and profits of prior years) is in excess of the reasonable needs of the business if it exceeds the amount that a prudent businessman would consider appropriate for the present business purposes and for the reasonably anticipated future needs of the business. The need to retain earnings and profits must be directly connected with the needs of the corporation itself and must be for bona fide business purposes. See § 1.537-3 for a discussion of what constitutes the business of the corporation. The extent to which earnings and profits have been distributed by the corporation may be taken into account in determining whether or not retained earnings and profits exceed the reasonable needs of the business. See § 1.537-2, relating to grounds for accumulation of earnings and profits. Section 1.537-1(b)(1) and (2) provide as follows: (b) Reasonable anticipated needs. (1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation *290 must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business. (2) Consideration shall be given to reasonably anticipated needs as they exist on the basis of the facts at the close of the taxable year. Thus, subsequent events shall not be used for the purpose of showing that the retention of earnings or profits was unreasonable at the close of the taxable year if all the elements of reasonable anticipation are present at the close of such taxable year. However, subsequent events may be considered to determine whether the taxpayer actually *291 intended to consummate or has actually consummated the plans for which the earnings and profits were accumulated. In this connection, projected expansion or investment plans shall be reviewed in the light of the facts during each year and as they existed as of the close of the taxable year. If a corporation has justified an accumulation for future needs by plans never consummated, the amount of such an accumulation shall be taken into account in determining the reasonableness of subsequent accumulations. 1. Fire insurance: Petitioner, in the taxable years and before, did not carry any policy of fire insurance to cover its insurable properties. Although petitioner contends that it had a cash "reserve" for self-insurance, there was not any actual reserve account on its books for self-insurance. Petitioner argues, and in its statement it asserted, that it needed at the end of each of the taxable years "to allocate" 418 $275,000 (out of accumulated earnings) as a self-fire-insurance fund to provide insurance coverage of its buildings, machinery and equipment, inventories, and tools. It is concluded that the evidence does not establish that there was a reasonable need, or a reasonably anticipated *292 need, for a fund of $275,000 for self-provided fire insurance. It is concluded further that on the basis of the evidence, and lacking evidence of the reasonable and ordinary amount of commercial insurance coverage for petitioner's insurable properties at the end of each taxable year, a "reserve, " or allocation, of the total depreciated book values of the insurable properties was about $20,000; that the accumulated earnings at the end of 1959 were sufficient to provide for, and include, self-insurance; and that, for self-insurance, accumulations of the 1960 and 1961 earnings were not necessary. There never has been a fire at the Sausalito property. Petitioner did not have any appraisals made or introduce evidence to establish what amount would represent a reasonable self-insurance reserve on any basis, including the replacement cost of the buildings, in the event of total destruction by fire, and replacement cost of machinery and tools. No disinterested witness was called to testify about these matters. The book cost of the buildings is $16,098. There is no evidence about estimated costs of repairs or restoration in the event of fire, or about what would be a reasonable sum in petitioner's *293 particular business and industry for a self-insurance reserve fund. Petitioner's claim that $275,000 would represent a reasonable reserve fund is vague, general, speculative, self-serving, and is not supported by the evidence. The evidence shows that petitioner had net depreciable assets, including buildings and equipment, totaling $16,253.43 book value, as of the end of 1960, and $19,579.12 as of the end of 1961. The record is devoid of any factual and credible evidence about replacement cost. When asked whether the building had been appraised, Tiscornia conceded that it had not been appraised. Petitioner relied solely on Tiscornia's personal estimates about a reserve fund. His testimony, although entitled to some weight, is largely self-serving for petitioner, as he was its chief stockholder; and his opinions and estimates were not corroborated in any way by any evidence or proof. Petitioner did not establish that Tiscornia had any particular qualifications to express opinions about fire insurance coverage. The alleged "reserve" of $275,000 contemplates complete destruction by fire. Petitioner did not submit any evidence to show that the ordinary and customary insurance coverage *294 of an industrial building amounts to replacement cost. A reserve for self-insurance for fire loss indeed may be in excess of the depreciated book values of the properties, but there is a question whether actual fire insurance ordinarily is obtained in as large amount as the estimated cost of complete replacement of the properties. Replacement cost in the insurance industry is commonly understood to mean the amount of money it would require to replace the destroyed property with other property which is identical in quality and quantity. See Austin Clapp, 36 T.C. 905 (1961), affd. 321 F. 2d 12 (C.A. 9, 1963). In income tax law, a loss for purposes of a casualty deduction under section 165 is limited to the adjusted basis of the property. Section 1.165-1(c), Income Tax Regs. The adjusted basis of the properties at the end of 1960 and 1961, respectively, was $16,253.43, and $19,579.12. 2. Expansion and development of business: Petitioner argues that it had alleged plans for expanding its plant facilities and business operations, as follows: That its officers formulated a plan in 1927 to expand the business, and that pursuant to this plan, petitioner was recapitalized in 1929 to provide *295 for the subscription of an additional $450,000 in stock. However, only $192,790 par value of such authorized stock had been issued by 1960 and 1961. The expansion plans are said to have included enlarging its present operations (foundry and metal work), enlarging its facilities to handle increased business of its subsidiary, Federal Mail Chute, and the entering into the general construction business. When petitioner's San Francisco property was taken under condemnation, a tract of land was purchased in Sausalito, which included 6 1/2 acres of unimproved land on which concrete footings had been laid by the former user several years earlier. The alleged expansion program never went beyond mere talking stages. Petitioner has given the following reasons for not having progressed with plans, or a plan: (a) There were not sufficient funds accumulated by 1961. 419 (b) Between 1927 and 1951, the depression, World War II, and the threat of condemnation created uncertainty about the future of petitioner's business and, thus, delayed the development of the plan. (c) In 1959, the Sausalito zoning authorities declared a moratorium on new construction and building permits, thereby preventing the *296 erection of buildings on the 6 1/2 acre parcel. (d) Additional time was needed for further research to find a suitable, light but sturdy, material with which to manufacture mail chutes for the subsidiary corporation. (e) Petitioner's policy of depositing all available cash in banks, took precedence over setting aside funds for the building and expansion program. Having alleged that an expansion plan was adopted in 1927, petitioner concedes that there was a delay of over 32 years, and it finally admits that even as late as 1964, petitioner's officers had no more idea then than they had in 1927 as to when such alleged expansion program might be undertaken, or what an expansion and development plan would be. The historical facts, between 1927 and 1951, facts about the zoning matters in Sausalito, facts during 1959 through 1961, are of little avail to petitioner. While various factors could have caused delays in proceeding with an expansion program or plan prior to 1951, see Industrial Bankers Securities Corp. v. Higgins, 104 F. 2d 177 (C.A. 2, 1939), and after 1959, they do not serve to explain the absence of expansion activity between 1951 and 1959, a period when there was no war, depression, *297 or zoning restriction preventing an expansion program. In an effort to explain the delay, petitioner claims that: * * * Taxpayer would not have had sufficient funds in any event (without abandoning the successful and profitable policy of using its funds as deposits in lending institutions), to make the improvements on its remaining unimproved property at Sausalito, even if the officials of the city of Sausalito, had been ready to grant permits for the heavy industrial buildings which taxpayer plans to develop in that area. * * * The utilization of its funds for obtaining jobs better serves the interests of its business now, and therefore should take priority over immediate expansion into the broader field of building construction. Petitioner's allegations show, at the worst, the make-weight character of petitioner's expansion claim; and, at best, they serve to demonstrate that there was no definite and clear plan to expand petitioner's business and operation in 1960 or 1961, or in the foreseeable future. The record in its entirety shows that there was no clear and definite plan to develop the 6 1/2 acre tract, to enter the construction business, to expand, existing facilities, or to *298 provide for increased business of Federal Mail Chute. Petitioner, in the taxable years, or before, had not entered the construction business. Concluding his argument at the trial on this point, Tiscornia stated: All right, I submit to do all the work necessary to bring that 6 1/2 acres, Lot 28, with its development the way we want to handle it, will take at least a million dollars. However, no cost estimates, architect's plans, engineer's plans, or any plans were ever formulated, and none were offered, to support the figure of $1,000,000, or any other figure. At no time did petitioner's witnesses attempt to allocate the alleged estimate of one million dollars or any other amount, to any type of development, new facilities, expansion of any existing facilities, or to Federal Mail Chute expansion. In fact, in the taxable years, and after, petitioner had less hope for starting a development program than it had been between 1951 and 1959, when construction could have been started without fear of interference by the Sausalito zoning authorities. By the time this case was tried, a zoning ordinance had been enacted in Sausalito prohibiting the heavy-industry construction, which petitioner *299 claimed it had planned for the 6 1/2 acre tract. No evidence was offered to show that a date or year had been determined for beginning actual development, construction, or expansion. In fact, no such specific and clear plans ever had been made. No evidence was produced to show that there was in the taxable years, or even later, a definite plan to expand the business of the Federal Mail Chute, or that its business actually was to be enlarged or extended to a national operation. Federal Mail Chute did not have any representatives or business outside of California. Petitioner's witnesses testified that the reason that Federal Mail Chute's business was so small was that it was conducting research to find a new mail chute design, but there is no evidence that such alleged research actually 420 was carried on in 1960 or 1961. The only evidence relating to that matter consists of some sketches and letters dated December 8, 1965, and May 8, 1966, five years after the taxable years. This material in itself is neither persuasive, probative, nor relevant. There is here much less to support petitioner's claims about expansion than was present in American Metal Products Corporation, 34 T.C. 89 (1960), *300 affd. 287 F. 2d 860 (C.A. 8, 1961), where a similar contention was rejected. In that case a seven-year delay, despite a formal shareholder resolution embodying the general outline of an expansion plan, was held to indicate "an indefinite postponement of any purported plans." It is held that the delay of over 30 years, plus the lack in 1960 and 1961 of any written or clear and definite plans to expand and develop petitioner's business in the foreseeable future, indicate that there was such "an indefinite postponement" of a very vague idea and hope as to preclude a finding and conclusion that there existed at the end of 1960, and 1961, any reasonable anticipation of expansion and development which would justify an accumulation of earnings for such alleged purpose. See section 1.537-1(b)(1) of the Regulations, supra, which precludes our approval of this contention: Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business. It *301 is concluded that at the end of 1960 and 1961, petitioner did not have specific, definite, and feasible plans for the development and expansion of its foundry business or mail chute business, or for the development of the 6 1/2 acre tract of land, or for entering into a construction business which justified the accumulation of its earnings for 1960 and 1961, so as to have accumulated earnings in excess of its accumulated earnings at the end of 1959, and, therefore, the above contentions of the petitioner are rejected as the basis for accumulating its earnings for 1960 and 1961 for reasonably anticipated business needs. 3. Cash accumulations to obtain contracts and orders from banks: Petitioner makes two contentions which involve one general claim about the reasonable needs, and reasonably anticipated needs, of its business. They relate to obtaining contracts and orders from banks for ornamental metal fixtures to be installed in the offices of banks. Therefore, both contentions are considered together. One of them relates to an alleged, anticipated contract to manufacture and fabricate metal fixtures for the very large, new world-headquarters building (now under construction) of Bank *302 of America in San Francisco, on Kearney and California, and other streets. An apparently necessary caveat under the instant issue is this: The taxpayer-petitioner here is the corporation, Federal, not its late president, A. A. Tiscornia. The ultimate question is whether Federal accumulated its earnings for 1960 and 1961 without a reasonable need to do so, for its own business, in view of its large accumulation of earnings of prior years at the end of 1959. Some of the fact questions involve the bank deposits of Federal. Whether or not it is relevant under the instant issue that Tiscornia also kept large sums of his own cash in bank accounts has become a fact question only because of petitioner's theory and reasoning. However, the fact that Tiscornia kept large sums of cash in commercial and savings accounts is more directly related to the final question, whether Federal was availed of in the taxable years for the purpose of avoiding the income tax with respect to its shareholders. It is petitioner's theory and contention that in order to obtain contracts from banks, or even from one bank, Bank of America, it was necessary (1) for Federal to retain all of its available earnings (cash) *303 for every year, including 1960 and 1961, constantly, in both commercial and savings bank accounts; and (2) for its president, Tiscornia, also to keep on hand, in commercial and savings bank accounts, very large sums of his own cash. As is discussed hereinafter, petitioner's contention that it was not availed of in 1960 and 1961 (by accumulating the earnings of those years) for the proscribed purpose, loses much of its force if it is concluded under the instant issue that Federal, considered alone and apart from its controlling shareholder and president, did not have a reasonable business need, present and anticipated, to accumulate the taxable years' earnings in order to obtain orders and contracts from banks, each year, and also in order to set up a kind of "reserve" fund for an anticipated contract with Bank of America for metal fixtures to be installed 421 in the large, new, headquarters building in San Francisco. It should be noted that the construction of Bank of America's new headquarters building had not been started in 1961. It was not until about the summer of 1966 that the laying in of the foundations for that building was commenced. Moreover, Tiscornia stated at the trial *304 of this case that as late as the autumn of 1966, the plans and specifications for that building had not been fully completed. Although the petitioner's briefs are far from clear on the point involved under the instant issue, it is evident that petitioner has relied upon the statement filed pursuant to section 534(c) of the Code as the statement of its contentions in this case with respect to its alleged need, in general, to accumulate the earnings of 1960 and 1961 so as to provide for the reasonably anticipated needs of its business. In that statement, the petitioner asserted, with respect to an anticipated contract with Bank of America that it needed to have on hand (as a "reserve" fund) $100,000 to enable it to pay for materials, labor costs, and some additional machinery so that if and when Bank of America would give Federal a contract to produce metal fixtures for offices in the new world headquarters building, then Federal would be in a position to enter into such contract and proceed with production thereunder. For convenience, this contention is considered first. Again it must be noted that at the end of 1959 Federal's accumulated earnings totaled $492,107.85, per books, and *305 $540,897.40, as adjusted (as already explained). There are two reasons for rejecting the contention that Federal needed to accumulate the earnings of 1960 and 1961 in order to have on hand a fund of $100,000 in anticipation of a contract to produce fixtures for the new building of Bank of America. First, the accumulated earnings at the end of 1959 were more than sufficient to provide such fund of $100,000. Second, at the end of 1960 and 1961, there was not any tentative, preliminary, or actual agreement with Bank of America, or its representatives, about the terms of such anticipated contract. See section 1.537-1(b)(1) and (2), supra, of the Regulations. We have rejected two of petitioner's contentions, supra, relating to the claimed "reserve" of $275,000 for fire insurance, self-insured, and relating to the claim in the section 534(c) statement that it needed to accumulate earnings in excess of $500,000, and in excess of the appreciated value in 1962 of its holdings of securities, for anticipated expansion, development, and undertaking of a construction business. Even assuming, arguendo, that the letter of assurance in 1953 of the then president of Bank of America, Carl F. Wente, *306 represented a commitment that Bank of America would award in the future a contract to Federal for metal fixtures at a fair and reasonable price for the new world headquarters building; and even assuming that at the end of 1961, Federal reasonably could anticipate such eventual contract, nevertheless at the end of each of the taxable years, there had not been any estimation of the dollar amount of such anticipated contract, and there was not any definite plan for producing fixtures for the world headquarters building. Under all of those circumstances, and under our conclusions with respect to the two above-noted assertions of needs to accumulate earnings, the only conclusion which can be made is that Federal's accumulated earnings at the end of 1959 were more than sufficient to provide a reserve fund for such anticipated contract of Bank of America. There is no evidence to support petitioner's contention that a reserve fund for use under such anticipated contract with Bank of America should be $100,000. Respondent has argued correctly that the figure, $100,000, is an estimate made by Tiscornia "plucked from the air", which is a speculative amount that is not supported or substantiated *307 by any evidence or proof whatsoever. There is no evidence to suggest what sum of money might be needed for Federal's performance under such anticipated contract, and we do not find or conclude that at the end of the taxable years Federal needed to anticipate a future expenditure of $100,000, or any specific sum, with respect to such anticipated contract. All that can be concluded is that there is no evidence establishing that the accumulated earnings at the end of 1959 were not sufficient to provide for such anticipated contract assuming, arguendo, but not deciding the point, that a reserve fund of $100,000 for such purpose might be needed. The next point relates to the contention that Federal needed to continuously accumulate its earnings, each year, and for 1960 and 1961, in particular, in order to retain cash needed for maintaining deposits in banks in order to obtain jobs from banks in the annual operation of petitioner's foundry business. With respect to this 422 contention, it must be remembered, again, that petitioner's accumulated surplus at December 31, 1959, was reflected in its bank deposits and investments in securities as of that date. At the end of 1959, Federal's deposits *308 in banks totaled $370,992.58, as follows: Balances of savings accounts
$316,442.58
Balances of commercial accounts
54,550.00
Total deposits
$370,992.58 The evidence shows that Bank of America was the principal source of Federal's metal fixture business in the taxable years, in that 80 percent of Federal's sales in 1960, and 70 percent in 1961, were made to that bank. But the evidence does not show the specific figures for those sales in each of the taxable years. There is no evidence dealing with the sources of Federal's gross receipts of $101,417.92 in 1960, and $104,668.18 in 1961. Federal's gross and net profit from its foundry business in the taxable years were: Year
Gross profit
Net profit
1960
$41,219.75
$32,267.61
1961
44,658.86
33,688.54
During the years 1955 through 1959, Federal's gross receipts (sales) and its gross profit from sales ranged from a low in 1956 of $42,243.40 and $12,739.11, respectively, to a high in 1958 of $81,567.44 and $32,599.30, respectively. Federal's gross sales in 1960 and 1961, of more than $100,000 in each year, were the largest in the period of 1941 through 1961, but there is no evidence at all to account for the increases in petitioner's business in 1960 and *309 1961. The evidence about Federal's bank deposits relates to the years 1954 through 1961. At the end of 1954, for example, Federal's savings accounts totaled $245,420.13; its commercial account deposits totaled $88,704; and all of the bank deposits totaled $334,124.13. That total amount was fairly close to its total bank deposits of $370,992.58 at the end of 1959. Federal's gross sales and gross profit for 1954 were $40,401.97, and $18,652.10, respectively. At the end of 1960 and 1961, Federal's bank deposits totaled the amounts set forth below: 1960
1961
Savings accounts
$326,066.99
$335,821.57
Commercial accounts
102,511.00
158,806.00
Total
$428,577.99
$494,627.57
During the years 1954 through 1961, Federal maintained its largest deposits in savings accounts in United California Bank, usually totaling more than $200,000. It maintained during the same period its largest commercial bank accounts with Bank of America, but the balances in that bank were $101,224 and $141,519 at the end of 1960 and 1961, and in the earlier years, 1954-1959, those bank account balances were from $44,402, end of 1958, up to $119,584, end of 1955. There is no evidence of any particular relationship and correlation between *310 the amounts of Federal's deposits in bank accounts to the business it obtained in any year, 1954-1961, from any particular bank, including Bank of America. There is no evidence of any particular relationship and correlation between the amounts of Tiscornia's deposits in bank accounts during the years 1954-1961, and the business received by Federal from any bank, including Bank of America. There is no merit to petitioner's argument that Federal's deposits in banks in the taxable years, and in general, were in the nature of cash "reserves" which represented and took the place of "performance bonds" which sometimes are an incident of performance under a contract, and there is no evidence at all in support of that belated analogy in petitioner's reply brief wherein there is reference to Smoot Sand & Gravel Corporation v. Commissioner, supra, which on its facts is distinguishable from this case. Federal admits, and the evidence shows, that banks in general, including Continental Service Company, a subsidiary of Bank of America, negotiated their contracts for metal fixtures; that Federal was obliged to enter into negotiations to obtain contracts with and jobs from all of the banks which *311 were its customers; and that Federal obtained its business in general and in the taxable years on a general competitive basis and on the basis of quoting reasonable and fair prices for its products. It is recognized, of course, that there probably existed the customary business policy of banks of encouraging bank deposits on the part of those with whom business was done. But there is no evidence here that Federal received any business in the taxable years or in any year from any bank in which it maintained bank accounts, on the basis of the dollar amounts of its bank deposits. The evidence indicates that in order to obtain business from banks, Federal's prices had to be quoted within the range of the competition in its particular market; and the evidence does not indicate in any way a relationship 423 of any kind between business received from banks by Federal and Federal's deposits in any particular bank. The logical inference from petitioner's theory under this question is that petitioner never could distribute any of its earnings in any year because of the alleged necessity of depositing all of its available cash in bank accounts in order to obtain business from those banks. The *312 evidence does not support this unusual theory and contention. Moreover, there is no evidence which serves to explain a relationship between petitioner's net income from its foundry business in 1960 of $32,267.61, and of $33,688.54 in 1961, and the size of its total bank deposits of $428,577.99, end of 1960, and $494,627.57, end of 1961. It is held that petitioner did not have a reasonable need to accumulate its 1960 and 1961 earnings in order to obtain business from banks, or to obtain business in general, by means of depositing all of its available cash in bank accounts; or for the purpose of obtaining reasonably anticipated business. It is held, further, that with respect to a relationship between obtaining business and maintaining bank deposits, Federal's accumulated earnings at the end of 1959, as reflected by its bank deposits, as well as by investments, was sufficient to provide for its current and reasonably anticipated needs in the operations of its foundry and metal fixtures business. Upon the entire record, it is found and concluded that petitioner permitted its earnings and profits for 1960 and 1961 to be accumulated beyond the reasonable needs, and the reasonably anticipated *313 needs, of its business. The purpose of avoidance of income tax with respect to shareholders: The above finding and conclusion are determinative under section 533(a) of the Code of the proscribed purpose of tax avoidance with respect to Federal's shareholders, "unless the corporation by the preponderance of the evidence shall prove to the contrary." Section 533(a), "Evidence of Purpose to Avoid Income Tax", puts the burden on the taxpayer-corporation of rebutting the statutory presumption stated therein, which is a rebuttable presumption. That is to say, the taxpayer-corporation has a burden of proof with respect to whether it was availed of in the taxable period for the purpose of avoiding the income tax with respect to its shareholders, when it has been determined by this Court that the corporation's earnings and profits for the taxable period were permitted to accumulate beyond the reasonable needs of the business, and that burden is to prove a negative fact, namely, that even though earnings for the taxable period were permitted to accumulate, such accumulation was not for the interdicted purpose. In United States v. Donruss Co., supra, the following observations were made: The *314 accumulated earnings tax is one Congressional attempt to deter the use of a corporate entity to avoid personal income taxes. * * * Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 699 (1943). * * * It appears clear to us that the Congressional response to these facts has been to emphasize unreasonable accumulation as the most significant factor in the incidence of the tax. The reasonableness of an accumulation, while subject to honest difference of opinion, is a much more objective inquiry, and is susceptible of more effective scrutiny, than are the vagaries of corporate motive. In Donruss the Supreme Court rejected the proposition that the presumption can be rebutted by showing that tax avoidance was not the "dominant, controlling, or impelling" reason for the accumulation; and it concluded from the language, purpose, and legislative history of the statute that the correct interpretation of the statute is that the taxpayer-corporation "must establish by the preponderance of the evidence that tax avoidance with respect to shareholders was not one of the purposes for the accumulation of earnings beyond the reasonable needs of the business." The Supreme Court stated further: "In addition, *315 'purpose' means more than mere knowledge, undoubtedly present in nearly every case. It is still open for the taxpayer to show that even though knowledge of the tax consequences was present, that knowledge did not contribute to the decision to accumulate earnings." The evidence under this issue has been considered with considerations of the guidance of Donruss. Petitioner made the unusual argument that its principal shareholder, Tiscornia, maintained very large savings accounts because such deposits in banks were required and were necessary in order that petitioner would receive business from banks; that petitioner's own savings accounts in banks were not large enough to induce banks to 424 give their business to petitioner, so that Tiscornia's own, personal deposits in savings accounts implemented and supplemented petitioner's savings accounts deposits; and that since Tiscornia received interest on his large savings accounts, on which he paid income tax, and since Tiscornia could have avoided such bank account interest and tax thereon if he had invested his funds in tax-exempt securities (rather than depositing his money in savings accounts), it must be held that petitioner was not *316 availed of in the taxable years for the proscribed purpose of the avoidance of income tax on its shareholders. The balances in Tiscornia's savings accounts were $1,609,181.89 at the end of 1960, and $1,694,992.18 at the end of 1961. The balances at the end of 1960 and 1961 in petitioner's savings accounts were $326,066.99 and $335,821.57, respectively. Under petitioner's argument, in order to get the business of banks in 1960 and 1961, it was required and was necessary for petitioner to have in banks both its own and Tiscornia's deposits in savings accounts which, together totaled $1,935,248.88, and $2,030,813.75, at the end of 1960 and 1961, respectively. This novel argument is not supported by credible evidence. The petitioner failed to introduce evidence to show (or which would show) any proximate and direct relationship between Tiscornia's savings account deposits in 1960 and 1961 (or before or after), and petitioner's receipts of business from banks in 1960 and 1961 (or before or after). Petitioner relied upon Tiscornia's conclusions, in his testimony (which was self-serving in petitioner's behalf) that it was a good business policy, which would be "helpful" to petitioner, to *317 maintain very large cash deposits in bank accounts, and to deposit in banks all of the available cash of petitioner and of himself, the president, as a means of inducing banks to award contracts and jobs to petitioner. Opposed and contrary to Tiscornia's assumptions and conclusions, there is clear evidence here that the banks, all of them, followed the practice of negotiating contracts with suppliers of metal fixtures, of carrying on such negotiations on a competitive basis, and that petitioner was obliged to quote reasonable prices and terms in order to obtain contracts and jobs from all banks, in general. Moreover, there is no basis in the record here for concluding that Tiscornia's savings accounts represented "loans" to petitioner, in any respect. Furthermore, petitioner did not introduce (or attempt to introduce) any evidence to establish the negative fact that Tiscornia's practice of leaving very large amounts of his own cash in bank accounts (at interest) was not for purposes related to his own personal and business advantages. Both petitioner and Tiscornia as a witness failed to negate personal motives on the part of Tiscornia for depositing very large sums of his own cash *318 in savings accounts. That Tiscornia may have had his own business interests, as an individual, in mind is suggested by his own testimony about his business contacts during many years with several banks and, in particular, with officers of Bank of America. The record here indicates that Bank of America acquired parcels of real estate, for the location of its new world headquarters building, in the area where that building is being constructed, Kearny, Montgomery, California, and Pine Streets. The record shows that Tiscornia, personally, invested in real estate over a period of many years. Neither petitioner nor Tiscornia, as a witness, undertook to negate the possible inference that Bank of America had purchased any or some parcels of real estate from Tiscornia in the area where the contemplated building would be constructed. Upon the entire record, we are unable to accept petitioner's theory and contention that Tiscornia deposited his own funds, in large amounts, in savings accounts in banks, rather than investing the funds in tax-exempt securities, solely or even mainly for the purpose of helping petitioner in obtaining business from banks in the taxable years, and without any substantial *319 motivation directly related to Tiscornia's own, personal and business advantage. Petitioner's argument represents no more, on the basis of the record here, than conjecture and theory, and it is not supported by any credible evidence. We must conclude, therefore, that petitioner's argument is without merit and substance, and that it is entitled to little weight. The entire record relating to this matter leaves the impression that Tiscornia, as a witness, withheld, in his testimony, and did not state, his actual and real reasons for having elected during several years, including the taxable years, to deposit in savings accounts bearing interest approximately $1,500,000, thereby adding to his taxable income, rather than investing his funds in tax-exempt securities. 425 Such forbearance on the part of Tiscornia, as an individual, from reducing his own personal income tax liability by investing his funds in securities in such way as to avoid the tax-effect of leaving his funds in banks with the accrual of interest, cannot be attributed or ascribed to the petitioner, a separate tax entity, in connection with the burden upon petitioner to rebut the statutory presumption in section 533(a). *320 Section 533(a) provides that the fact that earnings are accumulated beyond the reasonable needs of the corporation's business "shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary." Petitioner failed to meet the burden of proof which it was obliged to discharge under section 533(a). There is not in the record here "a preponderance" of evidence which proves to the contrary the purpose to avoid the impact of the income tax on its shareholders, and on its principal shareholder, Tiscornia, which follows from the findings and conclusions herein that for the taxable years petitioner permitted the accumulation of its earnings beyond the reasonable needs of its business. In fact, there is no credible evidence that one of the purposes of the accumulation of petitioner's earnings for 1960 and 1961 beyond its reasonable needs was not tax avoidance with respect to its principal shareholder. See United States v. Donruss Co., supra.Petitioner failed to establish that the knowledge of the tax-effect upon its principal shareholder of distributing its earnings for 1960 and *321 1961 "did not contribute to the decision to accumulate earnings." See Donruss Co., supra. It is admitted and the record shows that Tiscornia's taxable income was $140,927.32 for 1960, and $110,600.75 for 1961, and that the applicable tax rate for each year was 89 percent. The declaration of dividends for 1960 and 1961 by petitioner and the distribution of its earnings for those years would have increased the taxable income of its principal shareholder. That fact was recognized by the petitioner and by Tiscornia, as a witness, during the trial of this case, as indeed it had to be recognized. See Gibbs E Cox, Inc. v. Commissioner, 147 F. 2d 60 (C.A. 2, 1945), affirming a Memorandum Opinion of this Court. Tiscornia, as the president, a director, and the controlling manager of petitioner was aware of the fact that distributions of petitioner's earnings in, and for, 1960 and 1961 would have the effect of increasing his income taxes. He was aware of the rates and burdens of the income tax. It is of significance, also, that petitioner did not pay any salary to Tiscornia, its active manager, during and before the taxable years; and that during the 20 preceding years, 1941 through 1959, petitioner *322 did not declare and pay any dividends. (The constructive dividend of $30,000 in 1958 is not explained.) See Raymond I. Smith, Inc., 33 T.C. 141, affd. 292 F. 2d 470 (C.A. 9, 1961). It is held that petitioner was availed of in 1960 and 1961 for the purpose of avoiding the income tax with respect to its shareholders, by permitting its earnings for those years to accumulate instead of being distributed. Therefore, the respondent's determinations imposing the accumulated earnings tax are sustained. United States v. Donruss Co., supra.
Decision will be entered for the respondent. Footnotes
1. A. A. Tiscornia was petitioner's counsel during the trial of this case and he filed its initial brief. He died on January 9, 1967. Following the death of A. A. Tiscornia, Albert G. Evans entered his appearance and filed petitioner's reply brief.↩
**. Gross profit from business not shown.↩
*. 1958 gross profit from business, $32,599.30, less deductions of $10,114.15, leaves not profit of $22,485.15. The evidence does not explain the reason for a deduction for inte rest of $33,983.15.
*. Not explained.↩
*. N.A. = Not Available.
*. Per exhibit.↩
*. The sources of other income are capital gain, and unexplained miscellaneous income. Column 3 includes the amounts in column 2, interest and dividends.↩